HYDE ATHLETIC INDUSTRIES, INC., and Saucony Shoe Manufacturing Company, Inc., Plaintiffs,

v.

CONTINENTAL CASUALTY COMPANY, Continental Insurance Company, Greater New York Mutual Insurance Company, Lumbermens Mutual Insurance Company, Federal Insurance Company, and Highlands Insurance Company, Defendants.

Civil Action No. 95–5822.

United States District Court, E.D. Pennsylvania.

June 16, 1997.

Paul W. Kisslinger, Anderson, Kill, Olick & Oshinsky, P.C., Philadelphia, PA, Catherine C. Pyune, Obermayer, Rebmann, Maxwell and Hippel, Philadelphia, PA, Eugene R. Anderson, Steven J. Dolmanisth, Anderson, Kill and Olick and Oshinsky, P.C., New York

City, Clare Marie Diemer, Joseph J. McGovern, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, PA, for Plaintiffs.

James E. Brown, Thomas G. Wilkinson, Jr., Cozen & O'Connor, Philadelphia, PA, for Continental Cas. Co. and Continental Ins. Co.

Thomas Paschos, John Gerard Devlin, John Gerard Devlin & Assoc. Philadelphia, PA, for Greater New York Mutual Insurance Company.

Joseph P. Sullivan, Joseph P. Klein, Law Office of Joseph P. Sullivan, Philadelphia, PA, Susan K.B. Urbas, Michael W. Morrison, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, Lawrence A. Monte, Law Office of Joseph P. Sullivan, Philadelphia, PA, for Lumbermens Mutual Casualty Company.

James B. Burns, Deasey, Mahoney & Bender, Ltd., Philadelphia, PA, for Federal Ins. Co.

Mitchell S. Pinsly, Philadelphia, PA, Marjorie H. Mintzer, Ellen G. Margolis, Sheft and Sheft, New York City, for Highlands Ins. Co.

## *MEMORANDUM*

CAHN, Chief Judge.

Plaintiffs Hyde Athletic Industries, Inc. ("Hyde") and Saucony Shoe Manufacturing Company, Inc. ("Saucony") have sued several of their insurance carriers, seeking, inter alia, the costs of defense and indemnity related to an environmental action. Before the court are Plaintiffs' motion for partial summary judgment against one of their insurers for breach of the duty to defend, and motions by three of the insurers for summary judgment on all counts. For the reasons explained below, Plaintiffs' motion is DENIED and Defendants' motions are GRANTED.

## I. BACKGROUND

### A. The Underlying Action

This insurance coverage action arises from a cost recovery and contribution action brought by the United States Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.

§ 9601 *et seq.* ("CERCLA") and its Pennsylvania counterpart, the Hazardous Sites Cleanup Act, 35 Pa.S.A. § 6020.101 *et seq.* ("HCSA"). The environmental cost recovery action, *United States v. Atlas Minerals and Chemicals, Inc. et al.* (the "*Atlas* action"), filed in this court as Civil Action No. 91–5118, involved the cleanup of the Dorney Road Landfill (the "Site") in Lehigh County, Pennsylvania. The complete factual history of the *Atlas* action can be found in *United States v. Atlas Minerals and Chemicals, Inc. v. Mabry,* Civ. A. No. 91–5118, 41 ERC 1417, 1995 WL 510304 (E.D.Pa. Aug.22, 1995), and the court will not restate that extensive and complicated history here. However, a brief synopsis of the history of the Site and Plaintiffs' involvement with it is required for a full understanding of this insurance dispute.

From 1958 through 1978, the Site was used as a landfill for the disposal of municipal solid waste and industrial hazardous waste. *Atlas,* 1995 WL 510304, at *3–4. The Pennsylvania Department of Environmental Resources ("PaDER") cited the owner of the landfill for violations and ordered that landfilling operations cease by January 1, 1979. *Id.* at *4. In 1979, the EPA began investigating contamination at the Site, leading to the Site's placement on the National Priorities List and the preparation of a remedial investigation and feasibility study. *Id.* at *4–5. The EPA and PaDER conducted a Superfund-financed emergency removal action at the Site in 1986. *Id.* at *5. The EPA determined that unacceptable health hazards existed at the Site, and identified Potentially Responsible Parties ("PRPs") for the environmental damage. *Id.* at *6–7.

In August 1991, the United States filed a cost recovery action against ten PRPs in this court pursuant to CERCLA and the Pennsylvania HSCA, seeking to recover the EPA's response costs incurred in the removal action. In 1994, the parties entered into, and this court approved, a consent decree between the original PRP defendants and the United States. The defendants agreed to pay approximately $1.2 million to reimburse the United States for its response costs, and agreed to pay for future oversight costs at the Site. *United States v. Atlas Minerals*

*and Chemicals, Inc.,* 851 F.Supp. 639, 647 (E.D.Pa.1994).

In 1992, the original PRP defendants became third-party plaintiffs by filing complaints for contribution against approximately sixty third-party defendants, including Saucony.[1] Following entry of the consent decree, each third-party defendant either settled with the third-party plaintiffs or was dismissed from the action, with the exception of Saucony and one other party. *Atlas,* 1995 WL 510304, at *2. This court held a nonjury trial in the third-party action, leading to the lengthy *Atlas* opinion. The court found that Saucony "generated, owned or possessed hazardous substances, and arranged by contract, agreement, or otherwise for the disposal of hazardous substances at the Site." *Id.* at *111. The court assigned Saucony a 0.44 percent share of the total liability for remediation at the Site. *Id.* at *113 (Appendix E–3). Plaintiffs estimate that the remediation costs at the Site will total approximately $22.7 million; Plaintiffs' share of the costs is 0.44 percent of that total, or approximately $100,000. Am.Compl. ¶ 36.

## B. This Insurance Coverage Action

On September 15, 1995, Hyde and Saucony commenced this action against six insurance companies. The Amended Complaint, filed in November 1995, contains seven counts. Count I seeks a declaration that the insurers owed a duty to defend Hyde and Saucony in the *Atlas* action; Count II seeks a similar declaration regarding the duty to indemnify Plaintiffs for the liability imposed in *Atlas.* Count III seeks damages for the insurers' alleged breach of their duties to defend and indemnify. Count IV seeks relief for violations of the Pennsylvania Unfair Insurance

Practices Act, 40 Pa.S.A. § 1171.1 *et seq.,* for allegedly (1) denying insurance coverage on the basis of policy language which the insurers knew to be ambiguous, (2) destroying expired policies in an effort to disavow insurance obligations, and (3) misrepresenting to the public and policyholders the scope of the coverage under comprehensive general liability policies. Count V asserts a conspiracy by and among Defendants and the insurance industry to misrepresent or conceal facts relating to the pollution exclusion clause in general liability policies. In Count VI, Plaintiffs seek damages pursuant to Pennsylvania's bad faith statute, 42 Pa.C.S.A. § 8371, for the insurers' alleged breach of the duty of good faith and fair dealing in handling Plaintiffs' insurance claims. Finally, in Count VII, Plaintiffs seek reformation of the insurance policies at issue.

### *The Policies at Issue*

Hyde and Saucony allege that two of the insurer defendants issued comprehensive general liability ("CGL") coverage: Continental Casualty Company ("Continental") and Greater New York ("GNY").[2] Continental sold Plaintiffs CGL policy number CCP 857–76–97, providing coverage between September 18, 1973 and September 18, 1974, with a limit of $100,000 of liability per occurrence. Am.Compl. ¶ 16. GNY sold Plaintiffs CGL policy numbers 1703–200–731, 1703–200–911, 1703–201–121, 1703–201–450, 1703–201–837, providing coverage from September 26, 1974 until September 26, 1979; each of those CGL policies had a limit of $100,000 per occurrence. Am.Compl. ¶ 17.

Plaintiffs allege that four of the insurer defendants provided excess, or umbrella, coverage: Lumbermens Mutual Casualty Com-

---

1. Saucony and Hyde, though listed separately in the caption of this case, will be treated as one entity in this opinion. Hyde executed an Agreement of Sale for all of Saucony's assets on June 13, 1968; the asset purchase was completed on October 24, 1968. On July 29, 1968, the entity referred to in the *Atlas* opinion as "Saucony II" was incorporated; Hyde became the sole shareholder. *Atlas,* 1995 WL 510304, at *57–58. This court found that Saucony II, a "wholly-owned subsidiary of Hyde," was responsible for the share of the clean-up costs attributable to both Saucony I and Saucony II. Am. Compl. ¶ 3; *Atlas* at * 92.

2. Plaintiffs originally asserted CGL coverage under a policy issued by Defendant Continental Insurance Company ("Continental Insurance"). During discovery, it was revealed that the Continental Insurance policy at issue was a boiler and machinery policy that provided no coverage for claims in the underlying *Atlas* action. By stipulation of the parties, this court entered judgment in favor of Continental Insurance on all counts of the Amended Complaint. Stipulation and Order, Apr. 22, 1997.

pany ("Lumbermens"), Federal Insurance Company ("Federal"), Highlands Insurance Company ("Highlands"), and Continental. Lumbermens umbrella policy number 4SX–002–421 covered the period of April 18, 1974 until April 18, 1977, and provided $5,000,000 per occurrence. *Id.* at ¶ 18. The Lumbermens policy responds when the underlying general liability insurance is exhausted. Five Federal umbrella policies covered "some time period beginning on February 6, 1976," and two Highlands excess policies covered the period between April 18, 1977 and April 18, 1979. *Id.* at ¶¶ 19–20.[3] Continental excess policy numbers RDX–893–58–47 and RDX–893–86–65 covered the period of April 18, 1977 until April 18, 1979 with a limit of $5,000,000 per occurrence. *Id.* at ¶ 21. The Continental policies are second-layer excess policies, meaning that they do not respond until the underlying general and excess policy limits are exhausted.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's role is to determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party, with all reasonable inferences viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255, 106 S.Ct. 2505, 2510–11, 2513–14, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating that no genuine issue of material fact exists, but if the non-moving party fails to produce sufficient evidence in connection with an essential element of a claim for which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

## III. CHOICE OF LAW

As a federal court sitting in diversity jurisdiction, this court applies the choice of law

rules of Pennsylvania, our forum state. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). According to Pennsylvania choice of law principles, two states have significant relationships and interests in this action: Pennsylvania, where Saucony is incorporated and the Site is located; and Massachusetts, where Hyde is incorporated and where Hyde entered into its insurance contracts with Continental, GNY, and Lumbermens.

In this case, the court is spared the task of resolving a choice of law question because there is no actual conflict between the potentially applicable bodies of law. "[W]here the laws of the two jurisdictions would produce the same result on the particular issues presented, there is a 'false conflict' and the court should avoid the choice-of-law question." *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997) (citations omitted). Research by the parties and by this court reveals that the laws of Massachusetts and Pennsylvania resolve the legal issues of this case in the same manner. In addition, no party has objected to the application of Pennsylvania law, so the court may consider any such objections waived. *See, e.g., Neely v. Club Med Management Services, Inc.*, 63 F.3d 166, 180 (3d Cir.1995). For these reasons, the court will eschew a choice of law analysis, and will apply Pennsylvania law.

## IV. DUTY TO DEFEND

Under Pennsylvania law, the duty to defend is broad. "[T]he issuer of a general liability policy has a duty to defend its insured when the allegations in the complaint against it could potentially fall within the coverage of the policy." *Air Products and Chemicals, Inc. v. Hartford Accident and Indemn. Co.*, 25 F.3d 177, 179 (3d Cir.1994) (citations omitted). The Defendant insurance companies have moved for summary judgment on the duty to defend, asserting that they had no duty to defend Plaintiffs in the underlying action. Plaintiffs have also

**3.** Federal and Highlands have settled with Plaintiffs, and are no longer Defendants in this litiga- tion.

moved for summary judgment against GNY on this count, asserting that GNY had a duty to defend and breached it as a matter of law.

## A. Pollution Exclusion Clause

Defendants argue that they had no duty to defend because the pollution exclusion clause unequivocally excluded any reasonable possibility of coverage for the underlying *Atlas* complaints. In determining whether a policy potentially covers a complaint against an insured, the court looks first at the language of the policy and its exclusions, because "the inquiry into coverage is independent of, and antecedent to, the question of duty to defend." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813–14 (3d Cir.1994) (citation and footnote omitted).

The CGL and excess insurance policies which Continental, GNY, and Lumbermens sold to Plaintiffs contain pollution exclusion clauses. The clauses, with little variation, read as follows:

Exclusions

This insurance does not apply:

. . .

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental[.]

Continental Commercial CGL form policy, Exh. 9, Continental Mot.Summ.Judg.; GNY CGL policy, Exh. E, Pltf.Mot. Partial Summ. Judg.; Lumbermens CCL policy, Exh. A, Lumbermens' Mot.Summ.Judg.

■ The meaning and application of the pollution exclusion clause, and of the "sudden and accidental" exception to the exclusion, form the heart of the parties' dispute. The Third Circuit Court of Appeals, predicting Pennsylvania law, has held that a pollution exclusion clause identical to the ones in Plaintiffs' insurance policies is unambiguous, and that the exception for sudden and accidental discharges "applies only to discharges that are abrupt and last a short time." *Northern Ins. Co. of New York v. Aardvark Assoc., Inc.*, 942 F.2d 189, 193 (3d Cir.1991). At trial, the insurers bear the burden of proving that the pollution exclusion applies to prevent coverage, but the burden of establishing the "sudden and accidental" exception to the pollution exclusion rests with the insureds. *See id.* at 194–195.

■ After looking at the coverage and exclusion language in the policies, the next step is to analyze the underlying complaints in the *Atlas* action. If the allegations of the underlying complaint, if proven true, "could potentially fall within the coverage of the policy," the insurer has a duty to defend. *Air Products*, 25 F.3d at 179 (citations omitted). Moreover, if the allegations of the underlying complaint "may or may not fall" within the pollution exclusion clause, the insurer must defend. *Id.* at 180 (citation omitted).

The underlying complaint by Defendant/Third-party plaintiff GAF Corporation against Saucony includes the following allegations:

From at least 1960 through 1978, Saucony at various times disposed of, or arranged for the disposal of, wastes that it generated at its Kutztown plant at the Site.

The waste that Saucony generated at its plant and that was disposed at the Site included scrap leather, glues and other wastes from its manufacturing processes.

Upon information and belief, the waste was a hazardous substance, as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14), or the waste contained hazardous substances, as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14).

Third–Party Complaint by Defendant GAF Corporation, Exh. A, Pltf.Mem.Opp. Cont.Mot.Summ.Judg., ¶¶ 59–61. The complaint of Defendants/Third-party plaintiffs Atlas Mineral and Chemicals, *et al.* alleges:

The Third–Party Defendants [including Saucony] . . . are liable or potentially liable persons pursuant to . . . CERCLA . . . in that by contract, agreement, or otherwise they arranged for disposal or treatment, or

arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by them, . . . at a facility (the Site) owned or operated by another party or entity and containing such hazardous substances.

. . .

The Third–Party Defendants [including Saucony] . . . are responsible persons pursuant to Section 701(a)(2) of the Pennsylvania Hazardous Sites Cleanup Act ("HSCA") . . . in that they generated, owned or possessed hazardous substances and arranged by contract, agreement or otherwise for the dispersal, treatment or transport for disposal or treatment of the hazardous substances.

Third–Party Complaint by Defendants Atlas Minerals and Chemicals, *et al.*, Exh. B, Pltf. Mem.Opp.Cont.Mot.Summ.Judg., ¶¶ 7, 15.

The original complaint in the underlying action, referenced in the third-party complaints, was by the United States ("Government's Complaint").[4] The Government's Complaint against the original Defendants (later Third-party plaintiffs) describes the hazardous substances found at the Site, including "numerous volatile, semi-volatile and inorganic compounds" in the ground water, and acetone and inorganic compounds such as chromium and lead in the surface water and sediment. Government's Complaint, Exh. B, Pltf.Mem.Opp. GNY Mot. Summ.Judg., ¶ 19. The Government's Complaint alleges:

The defendants . . . by contract, a agreement, or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, at the Site of hazardous substances owned or possessed by said defendants, or their predecessors. The Site contains such hazardous substances.

*Id.* at ¶ 28.

In opposing summary judgment based on the pollution exclusion clause, Hyde and Saucony argue that the Defendant insurers could

not, on the basis of the underlying complaints, have determined that the property damage at issue would be found to have been caused by the release of pollutants. In the alternative, Plaintiffs assert that the Defendant insurers could not, on the basis of the underlying complaints, have determined that none of the pollution at issue fit the sudden and accidental exception to the pollution exclusion clause. The court will first address the applicability of the pollution exclusion clause, then the applicability of the sudden and accidental exception.

1. *On the face of the complaints, does the pollution exclusion clause apply?*

In support of their assertion that the underlying complaints do not support application of the pollution exclusion clause, Plaintiffs argue first that the underlying complaints speak of property damage, but do not state that the property damage at the Site was caused by the discharge of pollutants. Therefore, according to Plaintiffs, the face of the underlying complaints contained claims for property damage which might have been caused by something other than the discharge or release of pollutants, and the insurance companies should have defended the complaints.

Plaintiffs' argument is unavailing. It asks the court to forget that the underlying Government Complaint and the two third-party complaints were CERCLA and Pennsylvania HSCA cases. The complaints refer repeatedly to the disposal and arrangement for disposal of hazardous substances, chemicals, and wastes which damaged the water and land around the Site. Reading the face of the complaints, no reasonable jury could conclude that the Government and the third-party plaintiffs are referring to anything *except* "the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants." The nature of the un-

---

4. It is not clear whether the claims managers at the Defendant insurance companies had before them the Government's Complaint when they made their coverage decisions. The parties have not briefed the question of whether the Govern- ment's Complaint should have been looked at as part of the underlying complaint. I include portions of the Government's Complaint here because I believe they illuminate the underlying facts in the *Atlas* litigation.

derlying claims clearly triggers the pollution exclusion clause. *See Humphreys v. Niagara Fire Ins. Co.*, 404 Pa.Super. 347, 590 A.2d 1267, 1272, *alloc. denied*, 528 Pa. 637, 598 A.2d 994 (1991) ("It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend.") (citation omitted).[5]

■ Second, Plaintiffs argue that "[A]rranging for the disposal of trash is not the equivalent of discharging pollutants within the meaning of the polluter's exclusion." Pltf.Mem.Opp.Cont.Mot.Summ.Judg. at 50. This argument, which draws a distinction between those who arrange for trash pick-up and those who actually dump the waste, has been rejected by the courts of this circuit. *See, e.g., Aardvark Assoc.*, 942 F.2d at 194 (no distinction between active and passive polluters); *Federal Ins. Co. v. Susquehanna Broadcasting Co.*, 727 F.Supp. 169, 176–77 (M.D.Pa.1989), *aff'd*, 928 F.2d 1131 (3d Cir.), *cert. denied*, 502 U.S. 823, 112 S.Ct. 86, 116 L.Ed.2d 58 (1991) (pollution exclusion applied to claim of insured who arranged for disposal of trash and was not an "active" polluter). Whether the damage is caused by the insured's discharge or some other entity (either the hauler of the waste or other users of the landfill) is irrelevant. In *Aardvark Associates*, the court of appeals held that the pollution exclusion "unambiguously withholds coverage for injury or damage 'arising out of *the* discharge, dispersal, release or escape' of pollutants, not merely the insured's dis-

charge, dispersal, release of escape 'of pollutants.'" 942 F.2d at 194. (emphasis in original). The damage alleged in the underlying complaints was clearly caused by the discharge or release of pollutants, so the pollution exclusion clause applies "irrespective of the role which the insured is alleged to have played in the pollution." *O'Brien Energy Systems, Inc. v. American Employers' Ins. Co.*, 427 Pa.Super. 456, 629 A.2d 957, 963 (1993), *alloc. denied*, 537 Pa. 633, 642 A.2d 487 (1994).

■ Finally, at oral argument, Plaintiffs contended that the underlying complaints do not unequivocally exclude the possibility that some of the remediation costs at the Site would not directly arise from pollution. For example, in this case, the road leading to the Site will need to be rebuilt or strengthened in order to support the heavy traffic of trucks carrying in the clay and soil to create a safe "cap" over the pollutants. Oral Argument Tr. 115. This creative argument finds no support in the case law. The cost of the road repairs is closely linked to the clean-up effort. The road requires repair only because the pollutants released at the Site must be covered by a large quantity of safe soil. The cost of the road repairs arises from the discharge of pollutants, and is covered by the pollution exclusion clause. *See Ohio Cas. Ins. Co. v. Spra–Fin, Inc.*, Civ. A. No. 94–7407, 1996 WL 4118, at *2 n. 1 (E.D.Pa. Jan.4, 1996) (rejecting as "without merit"

---

5. Plaintiffs have not called to the court's attention any cases involving landfills or CERCLA in which the pollution exclusion clause was inapplicable. Plaintiffs have cited a few cases in which the courts stated that the focus of the pollution exclusion clause is the actual release of pollutants into the environment, not the disposal of waste. *See Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*, 842 F.Supp. 125, 131 (D.N.J.1993); *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha*, 126 Wash.2d 50, 882 P.2d 703, 718–19 (1994). These cases are inapposite for several reasons. First, insofar as the duty to indemnify is concerned, the *Atlas* opinion held that there were actual releases of pollutants from the Site, and Plaintiffs' liability arises from those releases. Second, in both cases cited above, the determination that the pollution exclusion clause applied to the actual release of pollutants as opposed to their disposal in the ground was relevant only to the courts' analysis of whether the release was unintentional and unexpected.

Unlike in Pennsylvania, under New Jersey and Washington law, the "sudden and accidental" exception to the pollution exclusion clause compels coverage unless the insured expected or intended the discharge of pollutants. *Queen City*, 882 P.2d at 723; *Morton Int'l, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831, 875 (1993). While the insureds in those cases could argue that the discharge of pollutants was unintentional, they could not argue that the disposal of the waste had been. *Queen City*, 882 P.2d at 719–20. In this case, Saucony's knowledge and intent involving the pollutants have not been questioned by the insurers and are not disputed factual issues. What is important is that the underlying complaints do not even hint at the possibility that there was no release from the disposed trash. Therefore, the face of the complaints triggered the pollution exclusion clause regardless of whether the releases were intentional.

insureds' argument that underlying negligence allegations regarding the insureds' "operation of a treatment system for waters contaminated with hazardous substances" were covered by a CGL policy because the allegations about the treatment system "did not refer factually to the discharge of toxic substances.").

2. *On the face of the complaints, was there a reasonable potential that the pollution could be found to have resulted from a sudden and accidental release?*

█ Plaintiffs argue that looking at the face of the underlying complaints, the "sudden and accidental" exception to the pollution exclusion could potentially apply; therefore, the insurers breached their duty to defend by denying coverage based on the pollution exclusion clause. In support of this assertion, Plaintiffs have presented the affidavit and supplemental affidavit of John B. Robertson, a hydrogeologist who testified as Saucony's expert in the *Atlas* litigation.[6]

█ Robertson's original affidavit stated that the release of chromium from Saucony's chromium-tanned leather wastes happened suddenly and unpredictably. Robertson Aff. at 3. However, at his deposition, Robertson testified that in his opinion "there was not a release of hazardous substances from Saucony's waste." Robertson Deposition, Mar. 3, 1997, Exh. 43, Cont.Mot.Summ.Judg. at 98. He also testified that the chromium release described in his original affidavit did not occur, and was hypothetical in nature. *Id.* at

104–05, 157. Following this deposition testimony, Robertson prepared a supplemental affidavit, for which his quantitative analysis enabled him to conclude that "at least three sudden and accidental release events occurred from Saucony's trash at the site ... from January 1972 through March 1977." Robertson Supp.Aff.[7]

The Robertson affidavits discuss only the release of chromium. In contrast, the third-party complaints describe a pattern of disposal of "hazardous substances" in general. The Government Complaint discusses an assortment of hazardous substances at the Site, including benzene, ethyl benzene, styrene, naphthalene, toluene, acetone, arsenic, lead and cyanide, as well as chromium. That the face of the underlying complaints do not exclude the possibility of a sudden and accidental release of *chromium* from Plaintiffs' trash does not mean that the complaints can be read to describe property damage caused by sudden and accidental releases.

Accepting Plaintiffs' contentions regarding the chromium releases means only that "it is within the realm of possibility that *one* discharge of pollutants ... may have been sudden or accidental, and therefore may 'potentially' come within coverage." *Spra–Fin,* 1996 WL 4118, at *3 (E.D.Pa. Jan.4, 1996) (emphasis added). The possibility of a single discharge of chromium does not create an issue of fact on the duty to defend when the underlying "complaints and related administrative allegations clearly portray a process of pollution occurring over a period of years." *Aardvark Assoc.,* 942 F.2d at 195; *see also*

---

6. Plaintiffs, the insureds in this case, are permitted to use extrinsic evidence beyond the underlying complaint to demonstrate that the exception to the pollution exclusion clause applies. *Air Products,* 25 F.3d at 180. The original affidavit ("Robertson Aff."), dated September 25, 1995, is attached to each of Plaintiffs' briefs in opposition to summary judgment. The supplemental affidavit ("Robertson Supp. Aff."), dated March 21, 1997, is Exhibit V in Opposition to Continental's Motion for Summary Judgment.

7. The inconsistencies between Robertson's deposition testimony and his affidavits permit this court to disregard Robertson's affidavits in consideration of these summary judgment motions. *See, Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) (court may disregard affidavit that contradicts sworn deposition testimony in deter-

mining existence of a genuine issue of fact). Robertson's explanation for his inconsistencies, that at the time of his deposition he had not had an opportunity to complete his probability calculations, is not a credible one in light of the fact that Robertson is an expert witness and has been involved in this litigation for several years. In addition, the court is concerned that Robertson's opinion would be inadmissible at trial under Federal Rule of Evidence 702 because it may not meet the standards outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Nevertheless, the court has considered the substance of the affidavits, and concludes that they do not prevent entry of summary judgment on the duty to defend or indemnify.

*Spra–Fin,* 1996 WL 4118, at *3 (insureds' assertions of a single discharge do not trigger duty to defend when underlying complaints allege continuing pollution of groundwater); *Redevelopment Authority of the City of Philadelphia v. Ins. Co. of North America,* 450 Pa.Super. 256, 675 A.2d 1256, 1259 (1996), *alloc. denied,* 547 Pa. 730, 689 A.2d 235 (1997) (sudden and accidental exception does not apply when discharge began with sudden event but continued for eleven years).

The scenario envisioned by Robertson is one in which years of waste disposal, followed by a convergence of unusual circumstances, lead to a sudden and accidental release of pollutants. It is similar to the one presented in *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.,* 938 F.2d 1423 (1st Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). In that case, Belleville Industries and several other corporations were sued under CERCLA by the state and federal governments, and the insurance company brought a declaratory judgment action to determine its responsibilities under a CGL policy containing a pollution exclusion clause. *Id.* at 1424. In attempting to fit its case into the sudden and accidental exception to the pollution exclusion, Belleville pointed to two sudden and unexpected events during the time of the environmental damage at issue— a flooding rainstorm and a fire. *Id.* at 1426. The flood and the fire (and the water from the firehoses) had arguably increased or accelerated the property damage. The Court of Appeals for the First Circuit held that the sudden and accidental exception did not apply. The court discussed at length the "infeasibility of attempting to assess discrete 'fringe' events, [particularly] in the case of a company with a history of contributing over a lengthy period to a gradual accumulation of pollutants[.]" *Id.* at 1428. The court refused to construe the sudden and accidental exception to provide coverage in a situation where the "discharges consisted of long accumulated, unattended, and unsegregated pollutants, and were caused by events not clearly beyond the long-range reasonable expectation of the insured." *Id.* at 1427.

Similarly, in *Redevelopment Authority,* the court held that there was no duty to defend when the underlying complaint alleged a demolition of a service station led to the release of pollutants and property damage. 675 A.2d at 1259. While the initial release was arguably a sudden and accidental event, the underlying complaint alleged that the discharge of pollutants lasted eleven years. The length of the discharge at issue led the court to hold that the case fell "squarely within the policy exclusion for gradual pollution damage." *Id.*

For this reason, Plaintiffs' attempt to distinguish cases in which courts have applied the pollution exclusion clause based on the fact that those cases contained no evidence or suggestion of a sudden release is unconvincing. In this case, the damage caused by Robertson's purported sudden and accidental releases of chromium simply cannot be separated from the damage caused by years of pollution. Moreover, the underlying *Atlas* complaints contained no suggestion of a sudden release. Instead, they alleged that decades of pollution had led to contamination, property damage and a massive clean-up bill.

In *Techalloy Co., Inc. v. Reliance Ins. Co.,* the court held there was no duty to defend where the underlying complaint asserted "contamination which occurred on a regular or sporadic basis from time to time during the past 25 years." 338 Pa.Super. 1, 487 A.2d 820, 827 (1984), *alloc. denied,* Oct. 31, 1985 (internal quotation marks omitted). In *Centennial Ins. Co. v. Lumbermens Mut. Cas. Co.,* the court held that the disposal of wastes over a period of thirteen months could not be characterized as sudden or accidental. 677 F.Supp. 342, 348–49. (E.D.Pa. 1987). In *Aardvark Associates,* the court of appeals found that insurers had no duty to defend when the underlying complaints alleged a decade of waste disposal at a CERCLA site. 942 F.2d at 195–96. In this case, the underlying complaints refer to Saucony's disposal of wastes "at various times," "from at least 1960 through 1978." Third–Party Complaint by Defendant GAF Corp., Exh. A, Pltf. Mem. Opp. Cont. Mot. Summ. Judg., ¶ 59. Simply stated, the underlying complaints in this action "do not aver facts which would support a finding that discharges of pollutants at [the Site] were sudden and accidental." *Aardvark Assoc.,* 942 F.2d at 195

(internal quotation marks omitted). Therefore, the sudden and accidental exception does not apply and the defendant insurers did not breach their duty to defend.

## B. Late Notice

■ Because the complaints in the underlying *Atlas* litigation reveal that Defendant insurers are entitled to summary judgment on the duty to defend based on the pollution exclusion clause, the court need not reach Defendants' argument that the insurers were relieved of their duty to defend the *Atlas* case because Plaintiffs were late in providing notice of the underlying suit to the Defendant insurers. Nevertheless, the court will comment briefly on this late notice argument.

■ In order to prevail on a late notice defense, an insurer must prove that notice was untimely and that the delay caused prejudice to the insurer. *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193, 198 (1977). Late notice is an affirmative defense to coverage, for which the insurer bears the burden of proof. *Id.* 371 A.2d at 196.

The notice given to the insurers in this case was unquestionably late. The policies at issue contained notice provisions requiring Plaintiffs to provide detailed written notice of occurrences which might lead to lawsuits "as soon as practicable," and to "immediately" forward to the insurance companies all documents relating to any claims or suits against the insureds. Exh. 9, Cont. Mot. Summ. Judg.; Exh. B, GNY Mot. Summ. Judg. Saucony was named as a third-party defendant in *Atlas* on January 6, 1992. Plaintiffs first notified Continental, GNY, and Lumbermens of the *Atlas* claims by letters dated July 28, 1994. Exh. 14, Cont. Mot. Summ. Judg.; Exh. Q, GNY Mot. Summ. Judg.; Exh. C, Pltf. Opp. to Lumbermens' Mot. Summ. Judg. Accepting for the moment Plaintiffs' contentions regarding when their responsibility to notify the insurers arose and whether their notice to the insurers was sufficient to

trigger a duty to defend,[8] Plaintiffs delayed notifying their insurers by over thirty months. Plaintiffs claim that extenuating circumstances justify their untimeliness, but these claims are belied by uncontroverted evidence that Plaintiffs did not contact its insurance brokers for assistance in locating the proper insurance companies until 1994, two years after being named as a defendant. Deposition of Charles Gottesman, Jan. 7, 1997, Exh. 45, Cont. Mot. Summ. Judg., at 56–57.

The insurers have also made a strong case for prejudice as a matter of law. Whether and under what circumstances prejudice can be granted as a matter of law is a contested issue in Pennsylvania. *Compare Clemente v. Home Ins. Co.*, 791 F.Supp. 118, 120 (E.D.Pa. 1992), *aff'd*, 981 F.2d 1246 (3d Cir.1992) (prejudice as a matter of law when notification delayed by over three years and underlying litigation was settled); *Metal Bank of America, Inc. v. Ins. Co. of North America*, 360 Pa.Super. 350, 520 A.2d 493, 498, *alloc. denied*, 517 Pa. 607, 536 A.2d 1332 (1987) (prejudice as a matter of law when notice delayed by two years and underlying litigation was settled); *with Trustees of University of Pennsylvania v. Lexington Insurance Co.*, 815 F.2d 890, 898–99 (3d Cir.1987) (insurer must show that late notice caused insurer damages because timely notice would "have led to a more advantageous result"); *Life and Health Ins. Co. of America v. Federal Ins. Co.*, Civ. A. No. 92–6736, 1993 WL 326404, at *2 (E.D.Pa. Aug.25, 1993) (prejudice a question for the jury).

In this case, Plaintiffs conducted settlement negotiations and made crucial decisions, including the decision to proceed to trial, without notifying its insurers. Trial was already underway when the first notice letters were provided to the insurers. The result was over $1.3 million in legal costs for $100,000 in liability. This is clearly a case in which the insurance companies, if given an opportunity for early control over the litiga-

---

8. Beginning in September 1988, Plaintiffs received several PRP notices regarding the Site from the EPA. Exhs. C, F, G, I, GNY Mot. Summ. Judg. The parties disagree about whether the EPA notices triggered Plaintiffs' responsibility to notify their insurers of the suit. In addition, the parties disagree about whether Plaintiffs assert that notification of the underlying lawsuit is sufficient to trigger the duty to defend; Defendants argue that the insured must formally tender the defense to the insurer. The court need not address these disputes.

tion, might have chosen a different strategy to resolve the case. *Cf. Clemente v. Home Ins. Co.*, 791 F.Supp. 118, 121 (E.D.Pa.1992), *aff'd*, 981 F.2d 1246 (3d Cir.1992) (recognizing "that today legal fees can often be more financially burdensome than the judgments which the fees are incurred to avoid.").

## V. DUTY TO INDEMNIFY

■■■ "An insurer has a duty to indemnify its insured only if it is established that the insured's damages are actually within the policy coverage." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 821 (3d Cir.1994). The documents submitted in this case and this court's opinion in the underlying litigation establish that the pollution exclusion clause preclude coverage for Plaintiffs.[9] Plaintiffs have produced no evidence that the property damage involved in *Atlas* was caused by the sudden and accidental releases of pollutants. Therefore, the Defendant insurers did not breach their duty to indemnify by refusing to pay Plaintiffs' share of the remediation costs.

This court's findings of fact in the underlying *Atlas* litigation implicate the pollution exclusion clause. The court found that Saucony arranged for the disposal of over 1,500 tons of waste at the Site, and that the waste included toluene, ethyl acetate, acetone, methyl ethyl ketone, and leather trimmings and dust containing chromium. *Atlas*, 1995 WL 510304 at *60–63, ¶¶ 565, 570–574, 578, 584–588. In addition, the court made a specific finding that "[t]here has been a release or threatened release of hazardous substances at the Site." *Id.* at *107. For this reason, the court rejects Plaintiffs' contention that the pollution exclusion does not apply to the case because there was no specific finding of a release from Saucony's waste. Hyde and Saucony were held jointly and severally liable for all the damages at the Site, and the court apportioned each party's equitable share of the costs based on "how each party's

waste contributed to the harm." *Id.* at *108 (citation omitted).

The *Atlas* findings also reveal that there was no sudden and accidental release which caused the property damage at the Site. Saucony arranged for the disposal of waste at the Site from March 1961 to March 1977. *Atlas*, 1995 WL 510304 at *58, 61, ¶¶ 549, 577–579. The supplemental Robertson affidavit, which asserts three sudden and accidental releases of chromium from Saucony's trash at the Site, does not create an issue of fact regarding whether sudden and accidental releases caused the damage at the Site. The Robertson affidavits do not address the other potentially hazardous substances in Saucony's trash, such as toluene and acetone, and the court will not engage in the microanalysis that would be required to separate the damage caused by the chromium from the damage caused by these other substances, or in the microanalysis required to determine exactly when a chromium release occurred in the context of cumulative, regular trash dumping. *See Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 768–69 (6th Cir.1992) (looking to the "reality" of the insured's waste disposal activities rather than each release of pollutants because if the court isolated each release, "*all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment."); *Belleville Industries*, 938 F.2d at 1428 (explaining the futility of district court's attempt to perform a "microanalysis of a continuous pattern of pollution.").

Based on the foregoing discussion, the court determines that the Defendant insurers are entitled to judgment on Counts I, II, and III of the Amended Complaint.

## VI. THE EXCESS POLICIES

The excess insurers, Continental and Lumbermens, have moved for summary judgment

---

9. Because this court's opinion in the underlying *Atlas* litigation was not issued until after the Defendant insurers refused to provide a defense, and because the duty to defend is evaluated on the face of the underlying complaint, the *Atlas* opinion cannot be used in evaluating whether the insurers breached their duty to defend. However, because the duty to indemnify is determined

by looking at whether the underlying allegations actually fall within the policy coverage, the court may look to its findings of fact in *Atlas*. *See Techalloy Co.*, 487 A.2d at 828 (using the case record to determine whether the pollution exclusion clause or the sudden and accidental exception applies).

on additional grounds.[10]  Both argue that the attachment points for their policies have not and will not be reached.  Because the court has determined that the excess insurers, like the primary insurers, are entitled to summary judgment based on the pollution exclusion clause, the court need not reach these arguments.

## VII.  DECEIT

In Count IV of the Amended Complaint, Plaintiffs allege several claims of deceit grounded in Pennsylvania Unfair Insurance Practices Act, 40 Pa.S.A. § 1171.1 *et seq.* ("UIPA").[11]  Defendants' allegedly deceitful actions can be summarized as follows: first, deceit in the denial of Plaintiffs' defense and indemnity in the *Atlas* litigation based on language in the policies which Defendants knew to be ambiguous;  second, deceit in the destruction of expired CGL policies despite Defendants' knowledge of "longtail" coverage claims;  and third, deceit of the public and policyholders in the promulgation of the standard pollution exclusion clause contained in the policies.  The court will address the second claim in this section, and will discuss Defendants' understanding of the pollution exclusion clause and the promulgation of the pollution exclusion clause in the following section.

Plaintiffs have produced evidence that the Defendant insurers utilized "document retention policies," pursuant to which the insurers destroyed expired CGL policies.  Plaintiffs assert a claim for deceit based on the fact that the Defendant insurers destroyed these CGL policies after advertising to potential clients that CGL policies would protect insureds from long-tail claims twenty or thirty years into the future, and did not notify their insureds of the retention policy.  Plaintiffs also allege that the retention policy is further evidence of Defendants' bad faith.

The elements of a cause of action for fraud or deceit in Pennsylvania are:  (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) with intention to induce reliance thereby, (4) justifiable reliance on the misrepresentation, and (5) damages as a proximate result.  *Wilson v. Donegal Mut. Ins. Co.*, 410 Pa.Super. 31, 598 A.2d 1310, 1315 (1991) (citations omitted).  Plaintiffs have failed to produce any evidence of a misrepresentation by the Defendant insurers about the retention policy, of Plaintiffs' reliance on a reasonable understanding that the Defendants would retain the policies, or any damages resulting from the retention policies.[12]  Nor has Plaintiffs' research or the research of this court revealed a case in which a document retention and destruction policy supported a cause of action for deceit against the insurer.  Summary judgment for the Defendant insurers is therefore appropriate on this element of the claim.

## VIII.  CONSPIRACY TO MISREPRESENT OR CONCEAL FACTS

Count V, conspiracy to misrepresent or conceal facts, asserts what is referred to as a "regulatory estoppel" theory.  According to Plaintiffs, the drafting and regulatory history of the pollution exclusion clause reveals that the insurance industry and the defendant insurers intentionally misled state regulators and the public about the scope of the clause.  In addition, Plaintiffs urge the court to analyze the drafting and regulatory history of the pollution exclusion clause to

**10.**  By Stipulation filed on April 22, 1997, Continental's excess policies, numbered RDX 893–58–47 and RDX 893–86–65, were dismissed from this action without prejudice to re-assert claims under the excess policies if Plaintiffs' share of the *Atlas* remediation costs exceeds the policies' attachment points.

**11.**  The court reads Count IV as asserting a common law action for deceit rather than a statutory action based on the UIPA. Individual insureds have no private right of action under the UIPA. *See, e.g., Great West Life Assur. Co. v. Levithan*, 834 F.Supp. 858, 863 (E.D.Pa.1993).  However, the UIPA does not preempt common law actions

for deceit.  *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 58 (3d Cir.1992).

**12.**  The only evidence of a misrepresentation supporting this claim is a 1991 advertisement by Continental which warned potential buyers about being "surprised" in twenty years with a lawsuit. Exh. Z, Pltf. Mem. Opp. Cont. Mot. Summ. Judg. The advertisement states only that consumers should choose Continental because it has the financial strength to pay claims in the future;  the ad mentions nothing about Continental's treatment of expired policies.

support their claims of deceit. Plaintiffs allege that Defendants committed acts of deception by promulgating to state insurance regulators, and later selling to Plaintiffs, insurance policies which the Defendants knew to be ambiguous. The court rejects these arguments.

The seminal case in the development of the regulatory estoppel argument is *Morton International, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). In *Continental Cas. Co. v. Diversified Industries, Inc.*, 884 F.Supp. 937, 956–61 (E.D.Pa.1995), this court outlined the drafting history of the pollution exclusion clause, as it was described by *Morton* and several commentators addressing regulatory estoppel:

> Prior to 1966, standard CGL Policies afforded liability coverage for bodily and property damage "caused by accident," the term "accident" being undefined. *See, e.g., Casper v. American Guarantee & Liability Insurance Company*, 408 Pa. 426, 184 A.2d 247 (1962). Although insurers argued that these policies covered only brief catastrophic events, courts generally construed these policies to cover ongoing events that inflicted injury over an extended period so long as the injury was both unintended and unexpected from the insured's viewpoint. *Morton*, 629 A.2d at 849. *See, e.g., Casper*, 184 A.2d at 249 ("to constitute an accident, the occurrence must be an unusual or unexpected result attending the operation or performance of a usual or necessary act or event"). Therefore, the pre–1966 policies covered injury or damage resulting from extended exposure to pollutants. *New Castle County v. Hartford Accident and Indemnity Company*, 933 F.2d 1162, 1196 (3d Cir.1991)(*citing Moffat v. Metropolitan Casualty Insurance Company*, 238 F.Supp. 165, 172–73 (M.D.Pa.1964)).
>
> In 1966, the insurance industry revised its standard CGL Policy to afford coverage based upon the happening of an "occur-

rence." An occurrence was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Britamco Underwriters v. Grzeskiewicz*, 433 Pa.Super. 55, 639 A.2d 1208, 1210 (1994). The 1966 revision of the standard CGL Policy "was generally understood to cover pollution liability that arose from gradual losses, and was acknowledged as having been intended to broaden coverage by avoiding an implication that there was no coverage for a continuing condition as distinguished from a sudden event." *Morton*, 629 A.2d at 849 (citations omitted). As the Court of Appeals for the Third Circuit has noted, "the standard occurrence-based policy ... covered property damage resulting from gradual pollution." *New Castle County*, 933 F.2d at 1197.

> In 1970, the insurance industry, foreseeing an increase in the number of environmental claims and cognizant of the interpretation being given to the 1966 CGL Policies, set out to draft the standard pollution-exclusion clause. The standard pollution-exclusion clause was drafted by committees of insurance representatives sponsored by the Insurance Service Office ("ISO"), and its predecessor organization, the Insurance Rating Board ("IRB").

*Diversified Industries*, 884 F.Supp. at 957. The 1970 standard pollution exclusion clause appears in Hyde's CGL policies from Continental and GNY. In order to include this new version of the pollution exclusion clause in CGL policies, insurers were required to gain the approval of regulatory agencies across the nation. The IRB and the Mutual Insurance Rating Bureau ("MIRB") filed the pollution-exclusion clauses with state regulatory agencies throughout the country, including Pennsylvania.[13] In filing the clauses, the IRB and MIRB allegedly contended that the pollution-exclusion clauses merely clarified the occurrence-based insurance policy, and did not restrict coverage in any manner.

---

**13.** Defendant Continental subscribed to the IRB, and adopted IRB language in its policies. Deposition of Pamela Gillette, Mar. 5, 1997, Exh. Y,

Pltf. Mem. Opp. Cont. Mot. Summ. Judg., at 150, 154–55.

Because the pollution-exclusion clause has since been interpreted as a limitation on insurance coverage, however, Plaintiffs contend that the insurance industry, Defendants included, committed acts of deceit and conspired to fraudulently misrepresent the meaning of the pollution-exclusion clause in 1970.

In Pennsylvania, the courts have rejected using the regulatory and drafting history of the pollution exclusion clause to determine the clause's true meaning. *Northern Ins. Co. of New York v. Aardvark Assoc.*, 743 F.Supp. 379, 381(W.D.Pa. 1990), *aff'd*, 942 F.2d 189 (3d Cir.1991) (unambiguous language of pollution exclusion clause precludes court from analyzing clause's drafting history); *Lower Paxton Twp. v. U.S. Fidelity and Guaranty Co.*, 383 Pa.Super. 558, 557 A.2d 393, 402–03 n. 5, *alloc. denied*, 523 Pa. 649, 567 A.2d 653 (1989) ("[h]aving found the exclusion unambiguous on its face, we are bound to construe it in accordance with its plain meaning and may not refer to extrinsic evidence of the drafters' intent"); *Sunbeam Corp. v. Liberty Mut. Ins. Co,,* CCP Civ. A. No. GD95–13947, slip op. at 16–23 (Allegheny Cty., Apr. 2, 1997) (rejecting regulatory estoppel claim because, *inter alia*, the claim "rests on the assumption that the regulatory bodies ... did not function as regulators" in analyzing the plain language of the 1970 clause).[14] For this reason, the court will not look at the regulatory history to find an ambiguity in the pollution exclusion clause. In addition, Plaintiffs' deceit claims based on

Defendant insurers' denial of coverage on the basis of language the insurers "knew to be ambiguous" cannot survive summary judgment, as it makes no sense to allow Plaintiffs to claim that the insurers knew an unambiguous clause to actually be ambiguous.

■ Whether the drafting and regulatory history of the 1970 pollution exclusion clause can be used to support claims for deceit and conspiracy to misrepresent is a less settled question which few courts have addressed. In *Diversified Industries*, this court refused to dismiss, on a motion made pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim of conspiracy to misrepresent facts based on the drafting history of the 1970 clause. 884 F.Supp. at 959–61. At that time, I noted that the *Diversified Industries* opinion was apparently the first to apply Pennsylvania's fraud principles to an insurance company based on the pollution exclusion clause's history. *Id.* at 959–60. I declined to hold that the conspiracy to misrepresent claim was repugnant to Pennsylvania law, but emphasized that an insured would "face the burdensome task of producing evidence of an actual agreement between the [Defendant insurance company] and other entities, all of whom must have had an intent to defraud at the time of the pollution exclusion clause's adoption." *Id.* at 961 n. 28. In this case, at the summary judgment phase of the litigation, Plaintiffs have the burden of coming forward with some evidence of an agreement and an intent to

---

**14.** These opinions are in keeping with the majority view on regulatory estoppel; most courts either have not considered the regulatory history of the pollution exclusion clause in determining the clause's meaning or have held that the history does not support a finding of industry deception. *See, e.g., Federated Mut. Ins. Co. v. Botkin Grain Co.*, 64 F.3d 537, 541–42 (10th Cir.1995)(applying Kansas law, no regulatory estoppel when policy language clear and unambiguous); *Cincinnati Ins. Co. v. Flanders Elec. Motor Service*, 40 F.3d 146, 153 (7th Cir.1994) (under Indiana law, court will not look to drafting history of clause when language is unambiguous); *Montana Refining Co. v. National Union Fire Ins. Co. of Pittsburgh*, 918 F.Supp. 1395, 1402 n. 8 (D.Nev.1996) (regulatory estoppel "would likely be met with a dim reception in Nevada" because Nevada courts do not look to extrinsic evidence where contract language unambiguous); *Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co.*, 842 F.Supp. 575, 581–83 (D.D.C.1994), *aff'd sub nom., Charter Oil Co. v. American Employers' Ins. Co.*, 69 F.3d 1160 (D.C.Cir.1995) (predicting Missouri law, refusing to analyze history of clause in light of unambiguous language); *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.*, 407 Mass. 675, 682, 555 N.E.2d 568, 573 (1990)(because the clause is unambiguous, "we have no need to consider the drafting history of that clause or any statements made by the insurance company representatives concerning the intention of its drafters"); *But see, Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493, 498–500 (1992) (construing pollution exclusion clause in accordance with the representations made by the insurance industry to state regulators); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570, 573–75 (1990) (conclusion that pollution exclusion clause ambiguous supported by regulatory history).

defraud by the insurance industry. Plaintiffs have been unable to produce such evidence.

■ Claims for misrepresentation, or a conspiracy to misrepresent, require that a statement be "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false." *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (1994). Plaintiffs have presented the court with no evidence that the insurers knew or were reckless about the veracity of their statements to regulators; therefore, Plaintiffs have presented no evidence supporting this element of a misrepresentation claim. In addition, to the extent the misrepresentation claim is based on the insurance industry's alleged representation that it construed the pollution exclusion clause in a certain way and would continue to construe the clause that way in the future, Plaintiffs' claims fail because a misrepresentation claim cannot be based on a promise of particular conduct in the future. *See Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 563 A.2d 1182, 1187 (1989), *alloc. denied,* 524 Pa. 629, 574 A.2d 70 (1990).

The Court of Common Pleas of Allegheny County, Pennsylvania recently rejected a fraud claim based on the insurance industry's alleged misrepresentations to the Pennsylvania regulators. *Sunbeam,* slip op. at 23–25. In *Sunbeam,* Judge Wettick found that the insureds could not support a fraudulent misrepresentation claim because they could not point to a justifiable reliance by the recipient of the representation:

> The Pennsylvania Insurance Department, as a regulatory body, was in a position to know what property damage pollution claims were likely to be covered and likely not to be covered under the 1966 CGL Policies. Its staff and decision makers would also be expected to read the language of the proposed exclusion and to make an independent determination as to its meaning and, consequently, as to its

effect on the coverage provided through the 1966 policies. This is not a situation in which the Pennsylvania Insurance Department needed any information from the insurance industry to make a decision as to the potential impact of the proposed pollution exclusion. Consequently, there could be no justifiable reliance by the recipient on the misrepresentation.

*Id.* at 25. Other courts have also noted that any reliance by state insurance regulators on insurance industry explanations would have been unreasonable. *Anderson v. Minnesota Ins. Guar. Ass'n,* 534 N.W.2d 706, 709 (Minn. 1995) ("[h]aving previously concluded that the pollution exclusion clause is clear and unambiguous, we now conclude that reliance on any explanations contrary to the unambiguous meaning of the policy language is, as a matter of law, unreasonable");[15] *Goodyear Tire & Rubber Co. v. Aetna Cas. and Sur. Co.,* Civ. A. No. 16993, 1995 WL 422733 (Ohio App. 9 Dist. July 9, 1995) (unreported), *appeal denied,* 74 Ohio St.3d 1477, 657 N.E.2d 785 (1995)(rejecting claims for fraud and constructive fraud based on the insurance industry's representations about the 1970 exclusion clause).

Plaintiffs have not presented the court with a shred of evidence that the Pennsylvania Insurance Department, a sophisticated regulatory agency, reasonably relied on IRB or MIRB statements contrary to the plain language of the pollution exclusion text. Nor have Plaintiffs presented credible evidence of a conspiracy or fraudulent intent by the IRB or its members. For this reason, the court has no basis upon which to send Plaintiffs' regulatory history-based claims for deceit and conspiracy to misrepresent to a jury.

## IX. BAD FAITH

Plaintiffs' Amended Complaint includes claims for bad faith pursuant to 42 Pa.C.S.A.

---

**15.** Minnesota had already refused to consider the drafting history of the clause in determining whether "sudden and accidental" were ambiguous terms. *Sylvester Bros. Dev. Co. v. Great Cent. Inc. Co.,* 480 N.W.2d 368, 377 (Minn.App.), *pet. for rev. denied* (Minn. Mar. 26, 1992). Therefore, the insureds in *Anderson,* like Plaintiffs in this case, did not argue that the clause was ambiguous; rather, they sought relief based on the insurance industry's misleading conduct in procuring approval of the clause. *Anderson v. Minnesota Insurance Guaranty Association,* 520 N.W.2d 155, 160 (Minn.App.1994), *rev'd,* 534 N.W.2d 706 (Minn.1995).

§ 8371. Plaintiffs contend Defendants acted in bad faith by:

(a) knowingly destroying Plaintiffs' liability insurance policies;

(b) disavowing their contractual insurance obligations for Plaintiffs' claim for coverage on grounds of "missing policies";

(c) delaying a coverage determination for well over a year after Plaintiffs made their claim for coverage;

(d) refusing to provide insurance coverage for Plaintiffs' claims because it was a gradual pollution claim even though Defendants previously covered similar gradual pollution claims and even though the facts suggest that at least a certain extent of the pollution was caused by abrupt discharges of pollutants;

(e) denying coverage on grounds of exclusions that do not exist in Plaintiffs' insurance policies;

(f) denying coverage without having conducted an adequate investigation of Plaintiffs' claim; and

(g) misrepresenting policy terms and conditions in the denial of insurance coverage.

Am. Compl. ¶ 110. In addition, in their briefs on these motions, Plaintiffs assert two additional theories of bad faith conduct. First, they argue that the insurance companies' conduct throughout the instant litigation provide further evidence of Defendants' bad faith. Second, they point to the drafting and regulatory history of the pollution exclusion clause, arguing that the insurers' efforts to enforce a different meaning of the pollution exclusion clause than the meaning they originally represented the clause to have are evidence of bad faith.[16]

Section 8371 does not define bad faith; in fact, "[t]here is no legislative history that specifically concerns this statute, which was enacted as part of a comprehensive insurance bill." *Younis Bros. v. Cigna Worldwide Ins. Co.*, 899 F.Supp. 1385, 1396 (E.D.Pa.1995), *aff'd*, 91 F.3d 13 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 737, 136 L.Ed.2d 677 (1997). However, this court has noted that section 8371 "was passed by the Pennsylvania Legislature specifically to rectify the lack of a common-law remedy for bad faith conduct in denying an insured's claim." *Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F.Supp. 353, 360 (E.D.Pa.1997)(footnote omitted). Recognition of this basis for the enactment of the statute led this court to follow the Pennsylvania Superior Court in adopting Black's Law Dictionary's definition of bad faith:

> "Bad Faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Id.* at 356, *citing, Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680 (1994), *alloc. denied*, 540 Pa. 641, 659 A.2d 560 (1995).

■ Based on the pollution exclusion clause, this court has granted summary judgment for the Defendant insurers on the coverage issues in this case. Since the denial of coverage by the insurers was proper and reasonable, there was no bad faith in that denial, and summary judgment on all Plaintiffs' bad faith claims relating to the denial of coverage is appropriate. The court of appeals has consistently dismissed bad faith denial of coverage claims in cases in which there is no duty to defend and indemnify. *See, Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.*, 44 F.3d 1194, 1206 n. 39 (3d Cir.1995) (awarding fees and costs for common law bad faith claim only against the insurer which had a duty to defend and indemnify, not against those insurers who had been found to be free of those duties); *Lucker Mfg.*, 23 F.3d at 821 n. 19 (summarily holding that there was no viable bad faith claim under § 8371 when there was no breach of duty to defend or indemnify).

---

**16.** For the reasons set forth in the prior section of this opinion, the court grants summary judgment to the insurers on Plaintiffs' regulatory history-based claims of bad faith.

Plaintiffs ask the court to send to a jury the claims of bad faith related to Defendant insurers' investigation of Plaintiffs's claim. This court has held, however, that "the crux of a bad faith claim under § 8371 is denial of coverage by an insurer when it has no good reason to do so." *Jung*, 949 F.Supp. at 360 (citation omitted). As I pointed out in *Jung*, most bad faith cases "deal with extremes: frivolous denials of coverage are clearly actionable, while an aggressive defense of the insurer's interest is not bad faith." *Id.* (citations omitted). The court has yet to be presented with a case in which an insurance company reasonably denied coverage, yet the insurer's related actions were found to be in bad faith. It is therefore unclear whether Plaintiffs can maintain their bad faith claims once it is determined that the insurers had a reasonable basis for denying the request for defense and indemnity.

■■■ Moreover, the documentation presented in connection with these motions reveals that summary judgment on the bad faith claims is appropriate. Every allegation of bad faith conduct relates to Defendants' investigation and denial of Plaintiffs' claims.[17] While an insurance company has a duty to accord the interests of its insured the same consideration it gives its own interests, an insurer is not "bound to submerge its own interest in order that the insured's interests may be made paramount," *Cowden v. Aetna Cas. and Sur. Co.*, 389 Pa. 459, 134 A.2d 223, 228 (1957), and an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage.

In asserting bad faith, Plaintiffs rely heavily on the actions taken by the insurers' claims representatives upon their receipt of Plaintiffs' notice of the *Atlas* suit in July or August of 1994. Plaintiffs allege that conduct of those handling the claims violated the UIPA and are therefore evidence of bad faith

conduct.[18] Specifically, Plaintiffs assert that the insurers did not communicate with Plaintiffs or make their coverage decisions in a timely manner, did not implement reasonable standards for the investigation of claims, and refused to pay the claims without conducting a reasonable investigation based on all available information. *See* UIPA, § 1171.5(a)(10)(ii)–(v).

■■■ The court will dispose of these contentions. At the outset, the court notes that the UIPA section to which Plaintiff refers states that "[a]ny of the following acts *if committed or performed with such frequency as to indicate a business practice* shall constitute unfair claim settlement or compromise practices." 40 Pa.C.S.A. § 1171.5(a)(10) (emphasis added). This court does not have evidence before it which would enable it to determine whether Defendant insurers committed the complained-of acts with such frequency as to constitute a business practice. This is particularly true of the insurers' alleged failure to implement reasonable standards for the investigation of claims. What constitutes a reasonable set of business practices for the investigation and evaluation of claims is a question properly left to the Pennsylvania Insurance Commissioner, not a judge or a jury. The bad faith statute addresses only whether insurers acted recklessly or with ill will in a particular case, not whether its business practices are reasonable in general.

■■■ Plaintiffs' demand that the insurers investigate their claims based on all available information is unwarranted. Defendant-insurers were not required to investigate the underlying facts of the *Atlas* suit. An insurer determines its obligations to defend its insured in a lawsuit by looking at the complaint. There is no bad faith in failing to investigate the underlying facts. *See Hum-*

---

17. The exception is the allegation of knowing destruction of Plaintiff's insurance policies. As discussed above, there is no evidence of bad faith or deceit in the implementation of Defendants' document retention and destruction policies. Nor is there any evidence to support Plaintiffs' assertion that the destruction of the policies constituted spoliation of evidence.

18. While the crux of a section 8371 claim refers to a bad faith denial of coverage, conduct allegedly "constituting violations of the … UIPA can also be considered in determining whether an insurer acted in bad faith." *Certainteed Corp. v. Federal Ins. Co.*, 913 F.Supp. 351, 360–61 (E.D.Pa.1995) (citations omitted); *see also Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1233 (1994).

*phreys v. Niagara Fire Ins. Co.,* 404 Pa.Super. 347, 590 A.2d 1267, 1272 (1991)(no bad faith when insurer fails to investigate facts of underlying complaint, because insurer "was required merely to look to the complaint, look at the nature of the claims against [its insured], and decide whether, if the allegations were proven to be true, would the policy provide coverage.").

Furthermore, the evidence presented reveals that Defendant-insurers did not violate the UIPA in their search for the missing insurance policies,[19] in the timeliness of their response to Plaintiffs' notification about *Atlas,* or in the timeliness of their decision to deny a defense the case. After receiving notice of the *Atlas* suit, Gerard Ragusa, GNY Claims Manager, responded with a letter dated October 18, 1994 which advised that GNY was "under no obligation to defend" the *Atlas* matter, listed the reasons for the refusal, and invited Plaintiffs "to submit additional information for our review in the event of your disagreement with our position." Exh. V, GNY Mot. Summ. Judg. Plaintiffs' next contact with GNY came on March 3, 1995, after trial had concluded. Exh. R, GNY Mot. Summ. Judg. The documents reveal that less than three months expired between Plaintiffs' notice to GNY dated July 28, 1994 and Ragusa's letter issuing a preliminary denial of coverage dated October 18, 1994. At Lumbermens, the delay was similarly brief. Claim Administrator Nancy Palmisano responded to Plaintiffs' July 28 letter with a letter dated October 12, 1994. The letter informs Plaintiffs of the decision to deny coverage in *Atlas* and lists several reasons for the decision. Exh. D, Pltf. Mem. Opp. Lumbermens' Mot. Summ. Judg. Plaintiffs have cited no support for the proposition that a three month delay in communicating with insureds violates the UIPA, particularly in a complicated environmental case in which the insurer was required to search for missing policies.

At Continental, Plaintiffs' notification of the *Atlas* suit was assigned to Stephanie Stevens, a senior claims analyst. The original July 28, 1994 letter from Hyde mentioned only Continental's "umbrella liability coverage for Saucony during the period April 18, 1977–78." Exh. 14, Cont. Mot. Summ. Judg. On August 18, 1994, Hyde contacted Stevens by phone and by letter to inform her that Plaintiffs had identified evidence of a general liability policy applicable to the claim, and provided Stevens with the policy number and effective dates for the Continental CGL policy. Exh. 15, Cont. Mot. Summ. Judg. For the next month, Stevens attempted to locate the missing policies. On September 28, 1994, after several more communications with Hyde representatives, Stevens issued a letter to Hyde, the purpose of which was to "reserve the right to deny coverage of this claim ... under the terms, conditions, definitions, and exclusions contained in these policies *in the event* that their existence is indeed proven." Exh. 17, Cont. Mot. Summ. Judg. (emphasis in original). Only two months elapsed between Plaintiffs' notification letter and Stevens' reservation of rights letter. Thus, Stevens' communications with Hyde and her preliminary coverage determination were timely, and did not violate the UIPA.

Plaintiffs contend that Stevens' search for the missing policies and her coverage determination were executed in bad faith. To demonstrate bad faith, Plaintiffs criticize decisions and omissions made by Stevens during her investigation. For instance, Stevens made an early notation in her file activity sheet, before her search for the policies began, that it was "highly questionable whether we ever issued [a] policy" to Plaintiffs. Exh. H, Pltf. Mem. Opp. Cont. Mot. Summ. Judg. Her first request for a policy search led to a search using the wrong policy number, and another of her requests led to a search using the wrong dates. Exh. I, Pltf. Mem. Opp. Cont. Mot. Summ. Judg. She neglected to perform a computerized "loss run" which might have led to a determination of whether a policy existed. Plaintiffs conclude that Stevens' conduct in searching for the policies demonstrates that there is at least an issue of fact about whether Continental acted in bad faith.

---

19. The allegations regarding the search for missing policies appear to be limited to Continental.

Ill will or recklessness is required for bad faith; mere negligence is insufficient to sustain liability. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir.1994). At trial, "bad faith must be proven by clear and convincing evidence and not merely insinuated." *Terletsky*, 649 A.2d at 688. Plaintiffs have dissected Stevens' actions in searching for the policies, emphasizing particular omissions rather than the complete story of her search. The record shows that Stevens began her search for the missing policies on August 18, 1994, the day after she was furnished with a policy number for the missing CGL policy. Exh. I, Pltf. Mem. Opp. Cont. Mot. Summ. Judg. When her search request led to an incorrect search, she ordered another search. *Id.* She contacted at least two branch offices in her search for the policies, and continued her search at least until she wrote her reservation of rights letter on September 28, 1994. While it may be true that Stevens and Continental did not do everything possible to locate the missing policy, Plaintiffs' assertion that Continental's search for the missing policies and investigation of their claims were not up to standard does not create a factual question of bad faith for the jury. Hyde's role in the *Atlas* case was complicated from the beginning, involving successor liability, subsidiaries, and a CGL policy that was over twenty years old. Plaintiffs could not locate the missing Continental insurance policy themselves, despite what they have described as an exhaustive search. Given the totality of the search effort, Stevens' omissions rise at most to the level of negligence. A reasonable jury could not find them reckless, and Plaintiffs have presented no evidence that Stevens or Continental acted with ill will.

Finally, Plaintiffs assert that Defendants' conduct in the course of this litigation is further evidence of bad faith. This case has been aggressively litigated by all sides, but there is no evidence that the discovery and other disputes which have arisen in the course of the litigation were caused by the ill will or recklessness of either insurers or insured.

Plaintiffs have presented the court with no evidence with which a jury could reasonably conclude that any of the Defendant insurers acted with recklessness or ill will in dealing with Plaintiffs' claims. Therefore, the court grants summary judgment for the Defendant insurers on Count VI of the Amended Complaint.

## X. REFORMATION

Finally, Plaintiffs seek reformation of their insurance policies "to include insurance coverage for unexpected and unintended pollution liabilities." Am. Compl. ¶ 120. Plaintiffs assert that they relied upon the insurance industry's misleading representations about the pollution exclusion clause, and the Defendant insurers knew that Plaintiffs were mistaken about the clause; thus, reformation is justified.

"Ordinarily, a mistake must be mutual to the parties to the contract in order to justify reformation of a written instrument on the basis of mistake." *Line Lexington Lumber & Millwork Co., Inc. v. Pennsylvania Publishing Corp.*, 451 Pa. 154, 301 A.2d 684, 687 (1973). However, a mistake by one party may also justify reformation if the other party has knowledge of that mistake. *Id.* 301 A.2d at 687–88. A party seeking reformation has the burden of proving by clear and convincing evidence that as a result of the mistake, the written instrument does not express the true intentions of the parties. *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F.Supp. 1147, 1149 (W.D.Pa. 1992), *aff'd*, 6 F.3d 780 (3d Cir.1993).

In the instant case, Plaintiffs have presented no evidence that they did not understand the meaning of the pollution exclusion clause, nor have they presented evidence that the Defendant insurers knew about any misunderstanding by Plaintiffs regarding the clause. Summary judgment for the Defendant insurers is therefore appropriate on Count VII of the Amended Complaint.[20]

---

20. While Plaintiffs have not asked for relief under the "reasonable expectations" doctrine of Pennsylvania insurance law, the court notes that no relief would be available under that doctrine for many of the same reasons that reformation is unavailable. The court has allowed substantial discovery, yet Plaintiffs have presented no evidence that it was unaware of any the plain lan-

## XI. CONCLUSION

The evidence presented in connection with these motions establishes that summary judgment should be granted in favor of the Defendant insurers on all counts of Plaintiffs' Amended Complaint. The complaints in the underlying *Atlas* action and the facts developed in that trial reveal that the property damage at the Site was caused by gradual pollution as defined by the pollution exclusion clause. The Defendant insurers' refusal to provide a defense and indemnity was reasonable and proper. Furthermore, there is no evidence to support a conclusion by a reasonable jury that the Defendant insurers deceived or conspired to misrepresent facts to Plaintiffs or the Pennsylvania Insurance Department. Nor is there evidence that the Defendants acted in bad faith. Therefore, Defendants' motions for summary judgment are GRANTED and Plaintiffs' motion for partial summary judgment is DENIED.

guage in its CGL policies, or that the Defendant insurers said anything to Plaintiffs at the time of contracting or renewing which would have led Plaintiffs to believe the pollution exclusion clause did not mean what it unambiguously says. *Cf. Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1312 (3d Cir.1994).