Barbara German **KOSIEROWSKI,**
Plaintiff,

v.

**ALLSTATE INSURANCE CO., Defendant.**

No. Civ.A. 98–5221.

United States District Court, E.D. Pennsylvania.

June 4, 1999.

Eric L. Keepers, Joseph F. Roda, Roda and Nast, P.C., Lancaster, PA, for plaintiff.

Marshall J. Walthew, Eric M. Schweiker, Dechert, Price & Rhoads, Philadelphia, PA, for defendant.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

Plaintiff · Barbara German Kosierowski brought this action alleging that defendant Allstate Insurance Company acted in bad faith in its handling of her claim for underinsured motorist benefits under her policy. Allstate now moves for summary judgment. Because the plaintiff has not shown the existence of a genuine issue of material fact through evidence that a reasonable jury could find to be clear and convincing, the motion will be granted.

## I.  Background [1]

The facts in this case are, for the most part, undisputed. On October 7, 1992, Kosierowski was injured when her vehicle was rear-ended by a car driven by an underinsured motorist (UIM). The tortfeasor was insured for only $15,000, but Kosierowski had a policy with Allstate that provided UIM coverage up to $100,000. By letter dated August 9, 1993, Joseph Mallon, plaintiff's attorney, informed Allstate that the tortfeasor's insurer had tendered its $15,000 limits and requested Allstate's consent to settle Kosierowski's claim against the tortfeasor. In response, Allstate sent a form letter asking Kosierowski to provide information about the tortfeasor before it would agree to settle the claim. Mallon informed Allstate that Kosierowski had no duty to perform this investigation and that Allstate was required to notify her within thirty days whether it would consent to settlement.

Allstate consented to settlement, and no action occurred in the case for almost two years following the settlement with the tortfeasor. On October 11, 1995, Mallon demanded UIM policy limits of $100,000, stating that Kosierowski had suffered lost wages and loss of earning capacity in excess of $118,000 and compensable medical expenses in excess of $12,000. On October 23, 1995, Allstate said that it would schedule plaintiff's independent medical examination (IME) after receiving Kosierowski's employment records, her medical records for the preceding ten years, and information pertaining to her marital and family status. Mallon provided some of this information by letter dated January 10, 1996, and asked Allstate to schedule an IME, which was performed by Dr. Bocher on February 7, 1996. Dr. Bocher issued a report on February 23, 1996, finding that Kosierowski had various soft tissue injuries. The report concluded that her symptoms were persistent and could continue indefinitely.

Over the next two months, Allstate requested additional information on plain-

---

1.  All background facts are taken from plaintiff's submissions unless otherwise noted. Plaintiff's name was German at the time of the events in question; she has since married and changed her name to Kosierowski. For convenience, the court will use plaintiff's married name.

tiff's medical and wage losses, and Mallon repeatedly brought up the possibility of arbitration should a settlement not be reached. On April 26, 1996, he unequivocally demanded such arbitration in accordance with the policy provisions. Allstate named Hugh Donaghue as its outside counsel, and on May 24, 1996, he named Alexander DiSanti as Allstate's arbitrator. Although Mallon had already identified Kosierowski's arbitrator, Allstate requested that name again. On May 29, 1996, Mallon telephoned Donaghue and informed him that Kosierowski had selected an arbitrator and requested scheduling of the plaintiff's sworn statement. More than four months later, on October 8, 1996, Donaghue scheduled the statement for October 28, 1996. A neutral arbitrator was not selected until October 15, 1996. It was shortly after these events, by letter dated November 8, 1996, that Mallon informed Allstate that he was considering a bad faith suit.

On November 20 and 22, 1996, Allstate ran Kosierowski's claim through Colossus, a computer program used by Allstate to calculate the settlement value of claims. The first evaluation produced a settlement range of $11,624 to $13,824, although Huber, the adjustor on the case, independently evaluated the case as worth $50,000 to $60,000. On the same day, Allstate made an offer of $50,000 to Kosierowski. Two days later, with the addition of different variables, Colossus produced a settlement range of $50,760 to $61,060. On December 5, 1996, Allstate gave Huber $100,000 in settlement authority, but Huber did not

exercise that authority, instead asking Mallon what he thought of the $60,000 offer. Mallon said that the offer was $50,-000, not $60,000; after negotiations, Huber made an offer of $80,000. Kosierowski agreed to accept $80,000 but would not release the bad faith claim. Allstate next offered $100,000 to settle the bad faith and the UIM claim, and Mallon refused, stating that plaintiff was still willing to accept $80,000 without a release of the bad faith claims. Finally, on December 8, 1996, Allstate agreed to settle the case for $100,000 with no release of the bad faith claim. Kosierowski accepted this offer.

Following these events, Kosierowski brought a claim of bad faith against Allstate for its handling of her case. Allstate now moves for summary judgment, arguing that (1) plaintiff has no evidence to support an award of punitive damages; (2) plaintiff has not presented sufficient facts from which a jury could conclude that Allstate acted in bad faith; (3) plaintiff has no proof that she suffered any harm by Allstate's actions; and (4) plaintiff's expert opinion does not provide clear and convincing evidence that Allstate acted without a reasonable basis. As the plaintiff has not presented evidence that a reasonable jury could find to be clear and convincing that Allstate acted in bad faith, the court does not reach defendant's first and third contentions.

## II. Discussion [2]

### A. Bad Faith

Pennsylvania law provides that

2. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn there-

from in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party. *See id.* However, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date· the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

■ In *Terletsky v. Prudential Property and Casually Insurance Company,* 437 Pa.Super. 108, 649 A.2d 680 (1994), the Pennsylvania Superior Court explained that bad faith by an insurer is

any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky,* 649 A.2d at 688. The plaintiff must demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (3d Cir. 1997). While an insurer is required to accord the interests of its insureds the same consideration it gives its own, it is not required actively to submerge its own interests. *See Hyde Athletic Indus. v. Continental Cas. Co.,* 969 F.Supp. 289, 307 (E.D.Pa.1997); *Leo v. State Farm Mut. Auto. Ins. Co.,·* 939 F.Supp. 1186, 1190 (E.D.Pa.1996).

*See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

■ To prevail on a bad faith claim, a plaintiff must prove both elements by clear and convincing evidence. *See Polselli v. Nationwide Mut. Fire Ins. Co.,* 23 F.3d 747, 750 (3d Cir.1994); *Leo,* 939 F.Supp. at 1190. Accordingly, the plaintiff's burden in opposing a summary judgment motion is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial. *See, e.g., Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Quaciari v. Allstate Ins. Co.,* 998 F.Supp. 578, 581 (E.D.Pa.1998).

### B. Plaintiff's Allegations

The plaintiff makes the following specific allegations of bad faith:

1. Allstate unreasonably delayed the resolution of Kosierowski's claim by refusing to appoint defense counsel and name an arbitrator and by failing to schedule a statement under oath for many months.

2. Allstate unreasonably made no settlement offer for more than a year following plaintiff's demand, even though its own doctor's medical opinion supported plaintiff's position; when settlement was eventually offered, it was unreasonably low.

3. Allstate improperly attempted to use settlement of plaintiff's UIM claim as leverage to obtain a release of the bad faith claim.

4. Allstate improperly asked Kosierowski to perform investigations that were Allstate's responsibility.

5. Allstate applied improper business practices to plaintiff's claim.

The court will consider each claim in turn.

### 1. *Delays in Naming the Arbitrator and Scheduling a Statement under Oath*

■ Delay is a relevant factor in determining whether bad faith has occurred,

but a long period of time between demand and settlement does not, on its own, necessarily constitute bad faith. Rather, courts have looked to the degree to which a defendant insurer *knew* that it had no basis to deny the claimant; if delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred. *See, e.g., Klinger,* 115 F.3d at 234 (suggesting that delay is relevant consideration in bad faith claim when insurer knew that liability was clear and there was no basis to deny claim); *Quaciari,* 998 F.Supp. at 582–83 (granting summary judgment for insurer in part because periods of delay were "equally attributable" to plaintiff and defendant; holding also that "even if all delay were attributable to Allstate, it would not, without more, be sufficient to establish bad faith"); *Grove v. Aetna Cas. & Sur. Co.,* 855 F.Supp. 113, 115 (W.D.Pa.1993) (stating that although multiple requests for information may constitute bad faith, delay is not necessarily equivalent to rejection of claims).

■ Plaintiff argues first that Allstate is guilty of bad faith in failing to appoint an arbitrator in a timely manner. According to the insurance policy governing this claim, if the parties cannot agree on the value of damages or the right to receive damages, the claim will be submitted to arbitration "upon the written request of either party[.]" Policy Provisions, Def.'s Ex. 2 at 22.[3] Although plaintiff states that she demanded arbitration at the end of February, *see* Plf.'s Ex. 16, the first unequivocal written demand is dated April 26, 1996. *See* Def.'s Ex. 18 at 2 ("Since it appears that you do not value the case as worth the policy limits, based upon our discussion, please appoint an arbitrator or we will file a petition with the court to appoint a neutral arbitrator."). Following that letter, Allstate appointed an arbitra-

tor by letter of May 24, 1996. *See* Def.'s Ex. 21 (appointing DiSanti as arbitrator). Previous references to arbitration in plaintiff's communications with defendant were clearly conditional and could not reasonably have been interpreted as a demand for arbitration within the policy terms, particularly given ongoing negotiations. *See* Def.'s Ex. 11 (October 11, 1995, letter from Mallon to Allstate stating that if arbitration were necessary, plaintiff would appoint Michael Paul); Def.'s Ex. 13 (January 10, 1996, letter from Mallon to Huber stating that "I am prepared to arbitrate this matter in order to bring it to a conclusion" and suggesting that parties discuss settlement to avoid that eventuality); Plf.'s Ex. 16 (February 29, 1996, letter from Mallon to Huber stating that "[i]n the event that this is not a case which you feel can be settled, I am appointing Michael Paul, Esquire, as plaintiff's arbitrator"); Def.'s Ex. 16 (April 1, 1996 letter requesting that Allstate "appoint an arbitrator pursuant to the policy terms if the case cannot be resolved now"). Considering this correspondence, the time elapsed between demand and appointment was only one month, not the three and a half months asserted by plaintiff.[4]

■ Plaintiff next argues that Allstate unreasonably delayed four and a half months in scheduling plaintiff's statement under oath. Kosierowski points to counsel's letter of August 7, 1996, in which Mallon reminded Allstate that he had requested on May 30, 1996, that Allstate contact him to set up a time to conduct the statement. *See* Plf.'s Ex. 21. Kosierowski also emphasizes Donaghue's statement that he routinely allocated one year for the scheduling and taking of a statement under oath, *see* Plf.'s Ex. 24 at 67, which plaintiff suggests is per se unreasonable.

---

3. Unless otherwise noted, all exhibits are from the motion for summary judgment or the response.

4. The court does note, however, that notwithstanding clear indications by plaintiff that she

would appoint Paul as her arbitrator from at least October 11, 1995, *see* Def.'s Ex. 11, 13, Allstate inexplicably requested the name of the arbitrator on May 24, 1996. *See* Def.'s Ex. 21; 23.

Allstate, however, has produced evidence indicating that much of the delay between the request and the actual scheduling of the statement under oath was related to the schedules of the relevant parties and, at worst, negligence. *See* Def's Ex. 26 (August 22, 1996, letter from Kosierowski's arbitrator requesting that DiSanti contact Allstate to get name of neutral once he returned from vacation); Def's Ex. 27 (October 7, 1996, letter from Kosierowski's arbitrator again requesting that arbitrator be named; noting that Mallon requested action).[5] The October 7 letter states that the two arbitrators had been missing each others' phone calls. *See id.* Donaghue himself explains that his hectic trial and deposition schedule, *see* Plf.'s Ex. 24 at 37–38, as well as conflict over the form of a medical release, *see id.* at 35–36; Def.'s Ex. 23, 24, contributed to the length of time before the statement under oath. The only evidence before the court indicates legitimate, if frustrating, delays that are an ordinary part of legal and insurance work. There is no evidence from which a reasonable jury could find that the delay was attributable to bad faith.

### 2. *Delays in Settlement and Unreasonably Low Offers*

Plaintiff next argues that Allstate acted in bad faith by failing to make a settlement offer for more than one year and then making "lowball" offers even though it knew the value of the claim from an early date. This claim relies heavily on plaintiff's argument that Allstate ignored the IME performed by its own physician which, according to Kosierowski, strongly supported her position. Kosierowski repeatedly emphasizes that Allstate had no more information in December, when it offered $100,000, than it did in February, when it offered nothing. The court agrees that a refusal to settle when liability and injuries are clear may constitute bad faith in some circumstances, *see, e.g., Klinger,* 115 F.3d at 235, but the plaintiff has not demonstrated a genuine issue of material fact as to the present case.

■ As it is central to an evaluation of this delay claim, the court will begin with the IME performed by Dr. Bocher on February 7, 1996. Taken most favorably to plaintiff, the report concludes that there were objective manifestations of injury following the accident and that the symptoms would persist indefinitely. *See* Def.'s Ex. 14 at 4–5.[6] However, defendant correctly argues that while the examination confirmed that the plaintiff was suffering from the repercussions of her injury, the value of that injury for purposes of claim payment was far from clear.

**5.** The August 22nd letter was cc'd to Mallon; the October 7th letter was bcc'd to Mallon along with a note stating, "Dear Joe, I've been pestering the hell out of him."

**6.** Specifically, Dr. Bocher stated:

The patient's examination revealed objective findings of muscle spasm in her lower lumbar area, mild nerve root irritation, nerve root deficit or compression of the sciatic nerve. There is certainly no objective motor deficit, sensory loss or reflex changes in either the upper or lower extremities to indicate any evidence of disc pathology or significant nerve root compression. She has minimal findings of the cervical spine with muscle spasm and a slight limitation of motion, but again a normal neurological examination.

The patient's symptoms reflect an ongoing mild soft tissue injury to the low back area, specifically and to a lesser degree the cervical area, which persists, suggesting that these symptoms will continue to manifest themselves for an indefinite time in the future. I can state, with reasonable certainty, that I do not believe that this woman will need any surgical intervention nor do I expect that these symptoms will worsen to any degree with time.

Def.'s Ex. 14 at 4–5.

In an earlier report, plaintiff's own doctor stated that "we can consider her ongoing symptomatology to be permanent and that she can expect to have to continue to follow-up for monitoring of her medication on a bi-monthly basis and be treated symptomatically for her ongoing complaints. She has significant functional limitations and limitations on physical capacities." Plf.'s Ex. 3 (report of Dr. Bonner, dated July 1, 1994).

■l This is particularly true given the persistent disputes regarding the wage losses and other expenses suffered by plaintiff. The initial demand letter of October 11, 1995, presented a total claim of $131,038, consisting $118,633 of past and future wage loss and $12,405 in medical costs. *See* Def.'s Ex. 11. However, as no documentation was included, on October 23, 1995, Allstate requested further information from Kosierowski's employer confirming past wage losses. *See* Def.'s Ex. 12; *see also* Plf.'s Ex. 7 (claims diary entry of October 22, 1996, stating that Mallon had provided no confirmation of the time lost). Kosierowski did not respond to this request until January 10, 1996, and the documents pertaining to wage loss were plaintiff's handwritten notes. *See* Def.'s Ex. 13. Following the receipt of these confusing records, Allstate attempted to acquire better documentation regarding past wage losses. *See* Def.'s Ex. 15, 16, 17. By letter of April 1, 1996, Mallon explained that plaintiff had no records from her second job and that her testimony would be her proof of her losses. *See* Def.'s Ex. 16. With respect to her primary job, it was not until April 26, 1996, that Mallon explained by letter that Kosierowski did "not have an actual loss of income due to her time missed from work as a result of the accident. Rather, she used her vacation time to cover the days that she had to miss as a result of the injuries from this accident. These are vacation days which she would other have been able to use for vacation." Def.'s Ex. 18 at 1. Given these undisputed facts, it cannot be said that Allstate acted unreasonably in asking for clarification from the plaintiff in the form of a statement under oath.[7] *See Hyde Athletic Indus., Inc. v. Continental Cas. Co.*, 969 F.Supp. 289, 307 (E.D.Pa.1997) ("an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage").

Admittedly, some of Allstate's actions were less than forthright. Following Allstate's receipt of the IME report, the claims log notes that "Dr. Bocher found spasms present in her back and neck, suggesting these symptoms will continue to manifest themselves for an indefinite period of time [to] the future." Plf.'s Ex. 7 (entry of February 23, 1996). However, Huber's deposition reveals that he gave the IME little credence and attempted to second-guess Dr. Bocher even though the report confirmed the objective existence of injuries. *See* Def.'s Ex. 45 at 110–13, 156–60. Allstate also appears to have taken inconsistent positions in its internal discussions and its negotiations with plaintiff. For example, Huber's diary entry for December 5, 1996, states that he had been given authority for $100,000 and that there was "not a lot to argue on our side." On the same date, he recounted his conversation with plaintiff's attorney in which he said, "We were still gathering info to evaluate until recently. Anyway, argued the weak points of his case, the fact it is only a soft tissue case and hard to accept as permanent. He of course argues the IME." Plf's Ex. 7 (claims entry of December 5, 1996). In addition, although Mallon had been given the impression by Donaghue that a statement under oath was very important to Allstate's resolution of the claim, *see* Plf.'s Ex. 20 at 192, Huber indicates that he himself did not believe that a statement under oath was necessary and that he did not use it in calculating the value of plaintiff's claim. *See* Plf.'s Ex. 13 at 133–36.

However, even considering these facts and the relatively favorable IME, there is not clear and convincing evidence from which a jury could conclude that it was

7. Kosierowski's statement under oath confirmed many of these points. She explained that, as she was salaried, she did not actually lose any money from her primary job at North American Manufacturing; rather, she lost vacation and sick days. *See* Def.'s Ex. 25 at 52–58. She also suggested that some of her later decrease in hours at her second job was voluntary, although she emphasized that she had cut back her hours by half because of the pain she suffered. *See id.* at 82–83.

unreasonable for Allstate to wait until November to evaluate the case and make a settlement offer. Even cases such as *Klinger* that acknowledge that a refusal to settle may constitute bad faith so hold only when the amount in question is clearly known by the insurer. *See, e.g., Klinger,* 115 F.3d at 235. This was not such a case.

■ The court also rejects the idea that negotiation—i.e., offering the bottom of an estimated settlement range—qualifies as bad faith in this case for similar reasons. Such an argument fails to consider the nature of the UIM policy purchased by plaintiff. Kosierowski's own policy states that Allstate would only pay damages that she would have been "legally entitled to recover from the owner or operator of an underinsured auto." Policy Provisions, Def.'s Ex. 2 at 14. Given the uncertain value of her injuries as well as the difficulty in determining what her recoverable damages would have been, it was not improper for Allstate to negotiate, and no reasonable jury could so find.

■ The Pennsylvania Superior Court explicitly recognized the subjective, uncertain nature of such claims in *Terletsky,* in which plaintiffs also claimed bad faith when an insurer made low settlement offers in the days before an arbitration. The court held that it was proper for Allstate to consider the questionable nature of those plaintiffs' injuries as well as to reduce the offer because of doubts regarding the liability of the respective parties; in fact, the Pennsylvania court explicitly held that it was acceptable for the insurer to reduce the offer by approxi-

mately fifty percent of what the case was "worth" given these doubts. *See Terletsky,* 649 A.2d at 688–89; *see also Leo v. State Farm Mutual Automobile Ins. Co.,* 939 F.Supp. 1186, 1191 (E.D.Pa.1996) (holding that there was no bad faith in requesting a statement under oath because claims were subjective and State Farm "could not properly assess the value of these claims without coming to some conclusion regarding whether the plaintiff was credible about her complaints of pain and ... the present effect on her life of the injuries she had sustained."). While Kosierowski strenuously argues that Allstate's offers to settle were prompted only by plaintiff's threats to bring a bad faith suit, it may be equally true that Allstate wished to avoid the expense of a prolonged arbitration process.[8] *See, e.g.,* Def.'s Ex 42 at 57–59 (Caslin deposition stating that Allstate authorized $100,000 not because it believed that was the case's "objective" value but because of the unpredictable nature of UIM awards).

Similarly, while plaintiff relies heavily on *Klinger* to support her position, it is quite different from the case at hand. In *Klinger,* the insurance company offered its insureds nothing in the face of clear liability and serious injuries. *See Klinger,* 115 F.3d at 232–33. The insurance company in this case did not stonewall; rather, it negotiated. It reached an agreement on the value of the case with plaintiff's attorney at $80,000 at one point, but a dispute about releasing the bad faith claim prevented the settlement. The soft tissue injuries in this case and the relatively low special damages left a wide window to evaluate the

---

8. Plaintiff repeatedly states that Allstate internally valued the claim as worth $100,000 on the eve of arbitration, but there is no evidence that Allstate reached such an objective determination. The court is unwilling to infer that settlement authority invariably constitutes a final, objective assessment of a claim's worth to which an insurer may be held on penalty of bad faith. *See, e.g., Voland v. Farmers Ins. Co.,* 189 Ariz. 448, 943 P.2d 808, 812 (Ct.App. 1997) (stressing that insurers' offer to settle for a particular amount "does not mean they

acknowledged that was the minimal amount the insurer's own adjuster ha[d] evaluated as being owed to the insured. Rather, the settlement offer was simply a proposal to compromise and resolve the claim.... It represented the carriers' evaluation or best estimate ... of what the trier (here, the arbitrators) might award.").

Analogously, the court will not take plaintiff's willingness to accept less than $100,000 as an indication that she "knew" that her claim was not worth the policy limits.

intangible element of pain and suffering, particularly as the original demand included losses that were arguably exaggerated. There was delay by both sides in asserting and evaluating the claim, which is consistent with negligence or bad judgment in not giving this particular case top priority on all agendas. The insurance company in *Klinger* forced that plaintiff to arbitrate a clear claim; the insurance company in this case did not.

### 3. *Allstate's Efforts to Obtain a Release*

■ Plaintiff maintains that Allstate committed bad faith in its attempts to acquire a release of her bad faith claim in settling the substantive components of her case. However, Kosierowski presents no evidence that would indicate that Allstate attempted to mislead or deceive her; the only evidence before the court suggests, on the contrary, that a genuine mistake occurred in conversations between plaintiff's counsel and Allstate's adjustor.[9] *See* Def.'s Ex. 37 (memo to file from Mallon stating that miscommunication had occurred between him and Huber); Def.'s Ex. 38 at 2 (letter from Mallon to Donaghue noting that mistake had occurred regarding the status of the bad faith release). The court further notes that it is not inappropriate for an insurance company to attempt to resolve all claims with one settlement, particularly when there is no indication of an attempt to mislead. *See, e.g., Palucis v. Continental Ins. Co.*, Civ.A. No. 98–356, 1998 WL 474108, at *2–3 (E.D.Pa. July 16, 1998) (dismissing bad faith claim and implicitly holding that seeking of release was appropriate); *Leab v. Cincinnati Ins. Co.*, Civ.A. No. 95–5690,

1997 WL 360903, at *5–7 (E.D.Pa. June 26, 1997) (holding that seeking release of claims was appropriate for insurance company as long as company did not know or recklessly disregard its lack of a reasonable basis for requesting release).

### 4. *Investigation Issues*

■ Two of plaintiff's claims of bad faith deal with requests by Allstate that she conduct investigations. Plaintiff first argues that Allstate acted in bad faith by asking her to investigate the tortfeasor's assets and actions on the day of the accident. Allstate essentially concedes this point, arguing only that because "[p]laintiff did not undertake to perform such an investigation[,] Allstate's request caused no harm." Def.'s Mot. for Summ.J. at 30 (citations omitted).[10] Plaintiff also claims that Allstate improperly asked her to investigate her own medical expenses. Allstate also does not deny that it asked for this information: rather, Allstate states that it "requested" the information and that "Mr. Mallon agreed to provide it." *See id.* at 31. Allstate also argues that Mallon admitted that he would have had to acquire this information himself, *see* Def.'s Ex. 4 at 229, and that consequently, Kosierowski suffered no harm.

One problem with Allstate's answers is that Allstate appears to have had some of the information that it requested that Kosierowski obtain. For example, although Allstate asked that plaintiff provide evidence pertaining to the tortfeasors' assets, Allstate had apparently already run an assets check for its own subrogation claim and ordered a second check for the UIM

9. The court will comment on plaintiff's expert's contention that the request for a release was a violation of the Unfair Insurance Practices Act in the discussion of the expert report itself.

10. For purposes of this motion for summary judgment, the court assumes that the six-year statute of limitations pursuant to 42 Pa.C.S.A. § 5527 applies. The statute of limitations for bad faith claims is unresolved, and the East-

ern District of Pennsylvania has issued contradictory rulings on the subject. *Compare Woody v. State Farm*, 965 F.Supp. 691 (E.D.Pa.1997) (holding that statute of limitations is six years under Pennsylvania's catch-all provision), *with Nelson v. State Farm Mutual Auto.*, 988 F.Supp. 527 (E.D.Pa.1997) (holding that statute of limitations is two years).

claim. *See* Plf.'s Ex. 7 ("Sent for assets and income check on claimant Ianucci") (entry of August 18, 1993); Plf's Ex. 13 at 132 (Huber testimony stating that Allstate had run "an income and assets check from a different office ... in regards to the subrogation claim"). Similar redundancy appears to have occurred regarding the ERISA program liens. Allstate requested that Mallon provide more information on this issue in a letter of April 17, 1996, *see* Plf.'s Ex. 28, but the claims diary suggests that Allstate had some of this information since February 23, 1996. *See* Plf.'s Ex. 7. Also, on December 6, 1996, Allstate's attorney requested proof from Mallon that Kosierowski's program was an ERISA qualified program. *See* Plf.'s Ex. 29. However, a claims diary entry of April 17, 1996 states that "[plaintiff's attorney] provides evidence of the excess health carrier's subrogation clause against third party carriers under an ERISA plan. They have placed [plaintiff's attorney] on notice of their subrogation lien." *See* Plf.'s Ex. 7; *see also* Plf's Ex. 5 (letter of April 1, 1996, giving name of program administrator).

Nonetheless, the investigatory conduct cannot qualify as bad faith. Even reading the claims diary and the deposition testimony most generously towards plaintiff, Allstate does not appear to have had all of the information it asked that plaintiff acquire. Nor can the plaintiff maintain that simply asking for information was bad faith, as the insurance policy itself obliges Kosierowski to supply information to the insurer: "As soon as possible, you or any other person making claim must give us written proof of claim including all details reasonably required by us to determine the amounts payable." Def.'s Ex. 2 at 20. The policy also states that "[a]n insured person must assist us in securing evidence, obtaining witnesses and in conducting suits. This includes submitting to signed statements and disclosing all facts." *Id.* at 21. As to the amount of information requested, no reasonable jury could find that Allstate's actions constituted bad faith given the difficulties in assessing Kosierow-

ski's damages. This is particularly true when the final value of the recoverable medical expenses turned out to be less than $3,500, notwithstanding plaintiff's earlier demands for more than $12,000.

### 5. *Pattern and Practice*

Plaintiff next alleges that Allstate acted in bad faith by utilizing a computer program, Colossus, that calculated the value of claims based upon "irrelevant" variables. Plaintiff also argues that Allstate has a policy of offering settlements of five percent below the value it internally assigns in an effort to increase its profit margin. This policy appears to exist with respect to at least some claims. *See, e.g.,* Def.'s Motion in Limine to Preclude Testimony by Sciotti, Ex. G (affidavit stating that Allstate's Harrisburg office has this policy with respect to third-party claims); Plf.'s Ex. 31 at 47 (deposition of David Graham, evaluation consultant at Allstate); Plf.'s Ex. 34 (excerpt from handbook stating that Allstate can increase profits by $34 million a year in UM/UIM by reducing all settlements by up to five percent).

There has been extensive discovery pertaining to these claims as well as extensive debate as to the appropriateness of considering broader insurance industry practice in the context of a bad faith claim. The court agrees that the bad faith statute is not intended to be a means for individual plaintiffs to attack an entire insurance industry; rather, it "addresses only whether insurers acted recklessly or with ill will in a particular case, not whether its business practices are reasonable in general." *Hyde Athletic Indus.,* 969 F.Supp. at 307; *see also Dombach v. Allstate Ins. Co.,* Civ.A. No. 98–1652, 1998 WL 695998, at *6 (E.D.Pa. Oct.7, 1998). However, should a plaintiff show that an objectionable business practice was used in handling his or her claim, this would go directly to the problems the bad faith statute intended to redress.

The difficulty in the present case is that the plaintiff has no information to demonstrate that such offending practices had any effect on her case. Allstate did use the Colossus program in calculating Kosierowski's claim. The first Colossus estimate, performed on November 20, 1996, gave a settlement range of $11,624 to $13,824. *See* Def.'s Ex. 34. The second estimate, performed on November 22, 1996, gave a settlement range of $50,760, to $61,060. *See* Def.'s Ex. 35.[11] The first amount is admittedly low and was based on the assumption that plaintiff did not have a permanent injury and that she had very low wage loss. However, even assuming that all of plaintiff's arguments about the impropriety of this program are correct, Huber did not rely on these programs in making his own settlement offer, which was, as discussed previously, initially $50,000.[12] Rather, it is clear that he consistently used his own judgment in determining the value of the case. *See* Plf.'s Ex. 13 at 163, 175–76. Similarly, plaintiff provides no evidence that the five percent program was applied to her claim, and it is hard to see how she could do so, given that she ultimately received the policy limits and $20,000 more than the amount for which she herself was willing to settle.

## C. Plaintiff's Expert Opinion

Plaintiff argues that Barbara Sciotti's expert opinion supports her claim that there is a genuine issue of material fact. The court disagrees. The mere presence of an expert opinion supporting the non-moving party's position does not necessarily defeat a summary judgment motion; rather, there must be sufficient facts in the record to validate that opinion. *See, e.g., Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1198–99 (3d Cir.1995).

In this case, while the defendant's motion for summary judgment and its motion in limine to preclude Sciotti's testimony overstate both factual and logical errors in the report, the expert opinion includes no analysis or interpretation that would alter the court's conclusion as to the insufficiency of the evidence presented by plaintiff. Sciotti places great emphasis on the fact that Allstate did not begin conducting an investigation of Kosierowski's injuries until 1995; however, Mallon himself concedes that he presented no demand package to Allstate until that time because he wished to ascertain the extent of her injuries *See* Def's Ex. 4 at 38–39, 69–72, 74–77.[13] Similarly, Sciotti discusses the long delay in scheduling the statement under oath, the repeated requests for information, and the relatively low settlement offers made initially, but she does not consider alternative reasons for the delay, most importantly, the difficulty Allstate had in acquiring records and clarifying plaintiff's damages. Her failure to consider Allstate's justifications for its actions is particularly true with respect to the requests for information. Nor does she fairly present the inconclusiveness of the IME report.

Sciotti makes reference to the Pennsylvania Unfair Insurance Practices Act (UIPA) and Unfair Settlement Practices Act and states that Allstate's apparent failure to comply with some of these regulations indicates bad faith.[14] However, even reliance on these statutes does not

11. Strangely, the second estimate makes the recommendation that an IME be performed, *see* Def.'s Ex. 35, even though Dr. Bocher's report had been completed almost eight months previously.

12. Even if the plaintiff had provided such proof, it is not improper for an insurer to consider such variables as credibility given the nature of a UIM claim. *See, e.g., Leo,* 939 F.Supp. at 1191.

13. In fact, this particular allegation was not included in the complaint.

14. The plaintiff and defendant have argued extensively as to the relevance of these statutes, both generally and in terms of their acceptability in an expert report. The court finds that it is proper for Sciotti to refer to these statutes and will consider them in this motion for summary judgment. While these statutes do not create a private cause of action, both Pennsylvania state courts and fed-

permit plaintiff's case to advance past the summary judgment threshold. The court agrees that Sciotti's points do not create a fact question sufficient to send the case to a jury. For example, she maintains that Allstate's request for a release was a violation of the UIPA but does not explain why the release might not be appropriate as falling within the same subject matter that gave rise to the claim payment. *See* 31 Pa.Code § 146.4(e). Similarly, Sciotti says that Allstate's supposed failure to send letters to the claimant every 45 days explaining why it had not yet evaluated her claim violated the UIPA. However, Allstate correctly points out that correspondence and requests for information occurred during virtually all of the pendency of plaintiff's claim. The court agrees that this fact alone cannot create a genuine issue of *material* fact. Sciotti's other, more significant, points have already been addressed.

In sum, Sciotti's report simply fails to consider much of the context of this case, and her report does not take into account the plaintiff's role in complicating negotiations. Nor does she acknowledge the legitimate difficulties present in virtually every aspect of this case. Consequently, the report does not create a genuine issue of material fact. *See Leo*, 939 F.Supp. at 1192 n. 9 (discounting expert report because opinion ignored the reasons presented by the insurer for its actions in bad faith claim).

## III. Conclusion

Both plaintiff and defendant have drawn the court's attention to the possible public policy implications of a decision in this case. Plaintiff maintains that granting summary judgment would send a message to insurance companies that they may properly treat their own insureds with the same suspicion and hostility that they treat third-party claimants. Defendant, in turn, argues that to permit this case to go to the jury would ultimately harm insureds by giving insurance companies an incentive to adhere to low, initial settlement offers because altering an offer in light of additional information would actually increase the risk that they would be subject to bad faith damages.

Ultimately, neither perspective fully considers the facts of this case and the difficulty of drawing any general conclusions from its resolution. As discussed at the hearing on the motion, this might be a different case if the injuries' value had been clearer or if the special damages had been readily ascertainable from the beginning. However, plaintiff is simply unable to demonstrate that Allstate's actions were unreasonable. Her claims for damages were inconclusive at best and contradictory at worst, and her own attorney did not always communicate promptly and clearly. The IME did not assist Allstate in placing a value on Kosierowski's claims, and it was therefore not unreasonable for Allstate to consider a variety of ranges in attempting to settle the case. Simply put, plaintiff's evidence does not establish a genuine issue of material fact as to Allstate's bad faith.[15]

An appropriate Order follows.

---

eral courts in this district have held that parties may refer to other statutes such as the UIPA and even Department of Insurance Regulations in demonstrating a claim of bad faith. *See Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1233 (1995); *see also Certainteed Corp. v. Federal Ins. Co.*, 913 F.Supp. 351, 360–61 (E.D.Pa.1995); *MacFarland v. United States Fidelity & Guar. Co.*, 818 F.Supp. 108, 110–11 (E.D.Pa.1993); *Rottmund v. Continental Assur. Co.*, 813 F.Supp. 1104, 1109 (E.D.Pa. 1992). The court, however, makes no com-

ment on the extent to which an expert may properly make explicit comment on such standards in his or her courtroom testimony if such a case should proceed to trial.

**15.** There are several motions pending in this case that have either been denied without prejudice or explicitly deferred to trial. The only motion that might bear upon the present issue is plaintiff's motion to compel the production of the unredacted claims file on the ground that defendant waived the attorney-client privilege by showing the file to one of

### ORDER

**AND NOW,** this 4th day of June, 1999, upon consideration of Defendant's Motion for Summary Judgment, and the response thereto, it is hereby **ORDERED** that the Motion is **GRANTED.**

its experts during a deposition. Based upon the affidavits supplied by defendant as well as by the facts described in plaintiff's motion, the court is satisfied that the defense expert inadvertently and briefly saw a portion of the claims file and that he did not base his opinion on that information. *See* Affs. of Michael Cerf and Marshall Walthew. In this context, such a single accident does not constitute a waiver of the attorney-client privilege, particularly given the speed with which the error was remedied and the fact that disclosure would not serve the overriding interests of justice. *See, e.g., Fidelity & Deposit Co. of Md. v. McCulloch,* 168 F.R.D. 516, 521–22 (E.D.Pa.1996) (using balancing test to determine whether waiver occurred); *Redland Soccer Club v. Department of Army,* 55 F.3d 827, 856 (3d Cir.1995) (upholding district court's decision that inadvertent disclosure of documents did not constitute waiver). Moreover, the court finds that even if a waiver did occur, the information in the claims file would not have created a genuine issue of material fact.