## Sanders v. State Farm

C.P. of Delaware County, nos. 95-4815, 97-16355.

*Elizabeth A. McHugh*, for plaintiff.
*Wayne A. Schaible* and *Patrick Shea,* for defendant.

BRADLEY, *J.,* July 27, 2000—Plaintiff, Jerome Sanders, appeals from the entries of summary judgment in this consolidated action.

Plaintiff-insured filed a bad faith and breach of contract action against defendant-insurer, State Farm Insurance Company, civil action no. 95-4815, alleging bad faith by defendant in the handling of plaintiff's claim. Thereafter, plaintiff filed a second action for defamation, slander, and ongoing bad faith against defendant, civil action no. 97-16355, allegedly as the result of defendant's actions throughout the litigation in the underlying action. These two cases were then consolidated.

On March 24, 1999, defendant's motion for summary judgment in civil action no. 97-16355 was granted. The Pennsylvania Superior Court by order dated August 25, 1999 quashed plaintiff's notice of appeal of this order granting summary judgment reasoning that it was not a final order. On January 19, 2000, defendant's motion for summary judgment in civil action no. 95-4815 was granted as to Count II (bad faith) and Count III (punitive damages), leaving Count I (contract) the sole issue to be determined in civil action no. 95-4815. On May 12, 2000, by order and stipulation, this remaining issue, Count I (contract) was severed from the consolidated case. Plaintiff's appeal from the entries of summary judgment in both actions follows.

In civil action no. 95-4815 as well as its companion case, 97-16355, the court was inundated with what can only be described as a blitzkrieg of paper. To explain our decisions granting defendant's motions for summary judgment in both actions, it is helpful to list chronologically the relevant and undisputed facts.

## FACTS

(1) On January 11, 1994, plaintiff's vehicle, a 1975 Chevrolet Corvette, was stolen from his home's locked garage.

(2) The Corvette was insured under a State Farm policy no. 385-1408-F31-381A.

(3) On January 11, 1994, Sanders contacted his State Farm agent, William Coleman, to report the theft of the Corvette and make a claim for the loss.

(4) On January 19, 1994, the Corvette was recovered by police in Newport News, Virginia.

(5) On January 19, 1994, an affidavit was prepared by Sanders permitting Mullen's T & A, (a repair shop chosen by Sanders) to tow the Corvette from Virginia to Pennsylvania.

(6) On January 24, 1994, State Farm informed Sanders that they intended to pay $500 for the vehicle to be towed from Virginia. Plaintiff's response to summary judgment motion, no. 95-4815, para. 19.

(7) On February 1, 1994, a State Farm representative in Virginia took photographs of the vehicle and concluded there was no damage to it. State Farm claim activity log.

(8) On February 3, 1994, Mr. Mullen from Mullen's T & A agreed to accept State Farm's offer of $500 to tow the vehicle from Virginia. Plaintiff's response to summary judgment motion, no. 95-4815, para. 21.

(9) On February 5, 1994, the Corvette was returned to Mullen's T & A garage in Pennsylvania.

(10) The bill for towing in the amount of $682 was received by State Farm on March 14, 1994.

(11) State Farm issued a check on March 15, 1994 to Mullen's T & A in the amount of $682 for the cost of towing the Corvette.

(12) On March 15, 1994, Sanders notified State Farm that there were scratches to the exterior body of the Corvette.

(13) A State Farm representative inspected the Corvette on March 22, 1994 at Mullen's T & A in Pennsylvania.

(14) The claim log indicates that on March 29, 1994, State Farm was in the process of writing an estimate to repair the exterior damage, *i.e.*, scratches to the hood. Claim log, entry no. 0035.

(15) On April 6, 1994, before State Farm notified Sanders of the status of his claim for exterior damage, Sanders informed State Farm for the first time that there were engine noises and that Mullen's T & A was seeking permission to tear down the engine to discover the nature of engine damage before the exterior scratches were repaired.

(16) On April 14, 1994, State Farm sent Sanders a letter giving him permission to have his mechanic, Mullen, tear down the engine to locate the damage, if any.

(17) Sanders agreed to accept State Farm's proviso that if the engine damage was not directly related to the theft, then he would be responsible for the cost of the teardown and repairs.

(18) On April 14, 1994, State Farm sent Sanders an affidavit of theft requesting information surrounding the theft of the Corvette.

(19) Sanders had previously completed and forwarded to State Farm an initial questionnaire in February 1994.

(20) The affidavit of theft was signed by Sanders on April 18, 1994.

(21) On April 29, 1994, Mullen's T & A contacted State Farm and reported that the engine was torn down and ready for inspection.

(22) The engine was inspected by State Farm on May 2, 1994.

(23) On May 24, 1994, Sanders provided a phone-recorded statement to State Farm claims specialist, Stephanie Mulhern, concerning the theft of the Corvette.

(24) On May 25, 1994, State Farm requested a detailed estimate of repairs from Mullen's T & A.

(25) On June 13, 1994, State Farm offered to pay for the engine repair less 75 percent betterment, to take into account depreciation on the 19-year-old engine that had over 113,000 miles on it.

(26) After State Farm's June 13 offer, plaintiff informed State Farm specifically for the first time that the engine was rebuilt. Plaintiff's deposition, pp. 141-42.

(27) In the affidavit of theft dated April 18, 1994, plaintiff indicated that the Corvette was a "rebuilt wreck" and the name of the rebuilder was L & D Automotive.

(28) Plaintiff informed his independent State Farm agent in August 1994 that the engine was being rebuilt and requested reduced coverages as the vehicle was off the road.

(29) At the State Farm inspection on May 2, 1994, the estimator noted that the engine had some new parts and looked like it had work done to it before.

(30) On June 18, 1994, plaintiff sent State Farm an original receipt from L & D Automotive (the repair shop that rebuilt the engine in August 1993) as evidence that the engine was rebuilt.

(31) The business name and address on the L & D Automotive invoice was handwritten and the town of Claymont was misspelled. The invoice indicated that Sanders paid $2,669.71 in cash for the repair.

(32) When a State Farm employee, Ms. Stephanie Mulhern, attempted to locate L & D Automotive, she discovered that the repair shop was not located at the address on the invoice. Ultimately, defendant did locate the mechanic who rebuilt the engine.

(33) State Farm forwarded the claim file to Jill B. Clarke, Esquire of McKissock & Hoffman, who on July 1, 1994, forwarded a letter to plaintiff requesting certain information and scheduling an examination under oath to take place on July 14, 1994. This "reservation of rights" letter also explained that questions regarding the "accidental" nature of the loss had arisen.

(34) Due to scheduling concerns, on July 14, 1994, the examination under oath was rescheduled to August 3, 1994.

(35) On August 3, 1994, the examination under oath took place at which time Sanders supplied an initial and incomplete estimate for property damage repair and engine repair.

(36) On August 10, 1994, Ms. Clarke received additional documents from Sanders and forwarded them to Ms. Mulhern, the State Farm employee who was handling the claim.

(37) On August 17, 1994, Ms. Clarke sent the transcript of the examination under oath to plaintiff for his review and/or to make any revisions.

(38) Sanders never signed a copy of the examination under oath.

(39) The policy language regarding the duties of an insured in a comprehensive theft loss, included the following:

"When there is a loss, you or the owner of the property also shall:

"(c) Show us the damage, when we ask;

"(d) Provide all records, receipts, or invoices, or certified copies of them. We make copies.

"(e) Answer questions under oath when asked by anyone we name, as often as we reasonably ask, and sign copies of the answers."

(40) State Farm obtained Mullen's revised estimate of engine repair on September 7, 1994.

(41) On September 16, 1994, State Farm issued a check in the amount of $6,575.68 in payment for the scratches to the exterior body and engine damage to the Corvette.

(42) In three letters dated October 3, 1994, October 17, 1994 and October 26, 1994, Sanders requested reimbursement for the rental replacement coverage while the Corvette was unavailable. The amount requested totaled $3,840.

(43) On November 2, 1994, State Farm responded to Sanders request informing him that he did not have RI (car rental coverage) on his vehicle at the time of the theft and that if he was seeking reimbursement under the comprehensive coverage transportation costs clause of the policy, he needed to provide State Farm with proof that he incurred such costs.

(44) On November 9, 1994, State Farm sent a second letter to Sanders reminding him to send any proof regarding transportation costs.

(45) Plaintiff admits rental reimbursement is not a coverage he had under the policy and he never forwarded any proof to support his claim for transportation costs under any other clause in the policy.

(46) Mullen completed the repairs on the Corvette in the fall of 1994 and plaintiff had the vehicle back by November, 1994.

(47) On January 25, 1995, Mullen reported to State Farm that there was transmission damage to the Corvette.

(48) On January 26, 1995, State Farm employee, Diane Keri, inspected the Corvette at Mullen's T & A repair shop to determine if the transmission damage was a result of the theft.

(49) On February 3, 1995, State Farm employee, Jim Siegal, and plaintiff's mechanic, Mullen, test drove and inspected the Corvette. It was the conclusion of State Farm that the transmission problem was related to the clutch which Sanders provided to Mullen's T & A when the engine was rebuilt previous to the January 11, 1994 theft. Mullen believed the transmission problem was related to the theft.

(50) On February 23, 1995, Ms. Keri inspected the Corvette again and again advised Mullen that State Farm believed the transmission problem was unrelated to the theft.

(51) State Farm denied payment for the transmission problems on the basis they were not causally related to the theft.

(52) Sanders admits that before his deposition, he never met State Farm employees, Stephanie Mulhern, Ron Costagliola, or Michelle Morris, or any of the other individuals that may have handled his claim.

(53) Michael Murphy, Esquire is outside independent counsel for State Farm in civil action no. 95-4815.

(54) Murphy hired Egis International Inc., an independent investigation firm to question listed witnesses in civil action no. 95-4815.

(55) The investigator, Thomas McGlinn, did speak to Ronald Paden, Bobby Paden and John Mullen, the mechanic about the theft.

(56) Martin E. Lauginiger, the chief of police of Lower Chichester, stated that on January 11, 1994, Sergeant Hanes of the Newport News Police Department in Virginia informed him that the operator of the stolen Corvette identified himself as Hector Martinez, the brother-in-law of the owner of the car, Jerome Sanders. Affidavit of Martin E. Lauginiger.

## DISCUSSION

Plaintiff's bad faith claims arise under 42 Pa.C.S. §8371 which provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorneys fees against the insurer."

The standard for bad faith claims under section 8371 is set forth in *Terletsky v. Prudential Property & Casualty Insurance Company*, 437 Pa. Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995). The Pennsylvania Superior Court applied a two-part test, both elements of which must be supported with clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded a lack of a reasonable basis. In opposing a motion for summary judgment in a bad faith case, a plaintiff must show by clear and convincing evidence that the insurer lacked

a reasonable basis for the denial of the claim and that it knew, or recklessly disregarded, the lack of a reasonable basis. *Polselli v. Nationwide Mutual Fund Insurance Company*, 23 F.3d 747, 750 (3d Cir. 1994); *Quarciari v. Allstate Insurance Company*, 998 F. Supp. 578, 581 (E.D. Pa. 1998); *McCabe v. State Farm*, 36 F. Supp. 2d 666 (E.D. 1999). Defendant's motions for summary judgment are properly supported and reveal that State Farm had a reasonable basis for its actions in handling and investigating plaintiff's insurance claim. Further, it is the opinion of this court that plaintiff has failed to meet his burden of coming forward with clear and convincing evidence that State Farm lacked a reasonable basis for its handling of plaintiff's claim.

## CIVIL ACTION NO. 95-4815

In this action, plaintiff alleges he has proven numerous instances of State Farm's conduct which would allow a jury to conclude that State Farm acted in bad faith in its handling of plaintiff's claim. First, he alleges that State Farm acted in bad faith when they failed to pay promptly his insurance claim for towing and body and engine damage. The undisputed facts reveal, however, that two months after his Corvette was stolen, his mechanic received a check in the amount of $682 for the cost of towing, and eight months after his Corvette was stolen, he received a check for $6,575.68 in payment for exterior and engine damage resulting from the theft. The towing bill was paid one day after it was submitted to State Farm and the damage bill was paid nine days after State Farm received the final estimate of engine repair from plaintiff's mechanic.

Furthermore, the delay in payment was mainly occasioned by plaintiff and his agents in first reporting damage ad seriatim over an extended period and second, in failing to provide in a timely fashion the proper documentation of expenses. State Farm did request that Sanders prepare an affidavit of theft, give a phone recorded statement, testify at an examination under oath and provide documentation to support a claim for a rebuilt engine. As all of these are consistent with the terms and conditions of the policy, they cannot be viewed as indicia of bad faith.

Numerous bad faith cases involving issues of investigation and delay in payment have been resolved by granting insurers' motions for summary judgment. See *Kosierowski v. Allstate Insurance Company*, 51 F. Supp.2d 583 (E.D. Pa. 1999); *Quarciari v. Allstate Insurance Company*, 998 F. Supp. 578 (E.D. 1998); *Leo v. State Farm Mutual Automobile Insurance Company*, 939 F. Supp. 1186 (E.D. Pa. 1996), *aff'd without opinion*, 116 F.3d 468 (3d Cir. 1997). In these cases, the delay in payment was longer than the delay in payment in plaintiff's case. Assuming for purposes of this motion only that all delay in this matter is attributable to State Farm, the eight months delay alone is not clear and convincing evidence of bad faith.

As defendant avers, numerous red flags developed soon after plaintiff's initial claim of property damages. These red flags included:

(1) An original set of car keys was in possession of the occupant of the car at the time of recovery in Virginia.

(2) This was an older model 1975 car with more than 113,000 miles on it.

(3) The car was purportedly stolen from a closed and locked home garage.

(4) There was no forced entry into that locked garage.

(5) There was no sign of forced entry into the vehicle.

(6) The tow yard in Virginia, as well as the Virginia claim representative, reported no apparent damage when the car was inspected in Virginia.

(7) Sanders did not report any damage to State Farm until 38 days after the car was returned to Pennsylvania by his mechanic.

(8) The insured did not report any mechanical damage to the engine to State Farm until 60 days after the car was returned to Pennsylvania by Sanders' mechanic.

(9) In answers to the questionnaire on January 19, Sanders claimed that he had all sets of the keys to the car in his possession, although it was later determined that that could not be true since the perpetrator who was discovered in the car in Virginia had one of the three sets of keys in his possession at that time.

(10) Sanders had suspended all coverage on the car prior to the theft claiming that it would not be in use, but nevertheless reinstated the comprehensive or theft coverage only in June 1993—several months before the theft.

After State Farm obtained an affidavit of theft, a recorded statement, and received additional engine claims and documentation from Sanders, additional red flags arose. They include:

(1) Sanders claimed that the engine had been rebuilt in the recent past for the first time more than four months after recovery of the car (despite opportunities to do so in an earlier questionnaire, affidavit of theft, and recorded statement).

(2) Sanders provided a receipt for the rebuilt engine that contained no printed letterhead, but a handwritten letterhead called "L & D Automotive."

(3) That receipt indicated payment in cash.

(4) The town of Claymont was spelled wrong on that receipt.

(5) It was noticed that the mileage of 113,694 miles, noted on the L & D August 3, 1993 receipt, was actually *lower* than the mileage on an earlier inspection sticker on that vehicle.

(6) State Farm claims representative, Ms. Mulhern, could not locate the L & D shop on her visit to the purported address in Claymont, Delaware.

(7) In the recorded statement and at the examination under oath, Sanders denied that the car was previously for sale, but he later admitted at his deposition that it was previously for sale for a month.

(8) Sanders had recently purchased a new vehicle.

(9) The stolen car had a burglar alarm which was deactivated by the operator without damage, and which required knowledge of the location for the key for that alarm in order to enter the car.

(10) In the examination under oath Sanders said he did not know the vehicle was recovered with the occupant in it, yet at the deposition he admitted that the police told him about an occupant.

According to State Farm, it was the existence of the above red flags which necessitated a more thorough investigation of the theft claim.

In *O'Donnell v. Allstate Insurance Company*, 734 A.2d 901 (Pa. Super. 1999), the Superior Court affirmed the jury verdict finding in favor of defendant Allstate on plaintiff's claim of bad faith. The suit arose out of an

alleged burglary of the insured's home. Numerous red flags arose during the investigation of the claim including incorrect receipts for items claimed to have been stolen and refusal to cooperate in the investigation so Allstate could confirm alleged losses. The Superior Court acknowledged that the existence of these red flags prompted a more thorough and protracted investigation by the insurance provider. *O'Donnell*, 734 A.2d at 907. Likewise in the instant case, the numerous aforementioned red flags provided State Farm with a reasonable basis to conduct a more thorough, albeit lengthier, investigation. It is important to note that the claim was paid in its entirety on September 16, 1994 which was less than 30 days after the examination under oath was transcribed and within nine days of State Farm receiving plaintiff's mechanic's revised estimate of engine repair.

An insurance company has a right under its policy to conduct a thorough investigation of a claim. Any reasonable delay caused by such an investigation does not give rise to a claim for bad faith. In the instant case, State Farm had a reasonable basis to conduct a thorough investigation. No reasonable jury could conclude that the delay attributable to that investigation rises to the level of bad faith proven by clear and convincing evidence.

Plaintiff also argues that State Farm's denial of his transmission claim constitutes bad faith. The transmission damage complained of was not discovered until a year after recovery of the Corvette and several months after the engine rebuild, while Sanders was driving it. State Farm's experts inspected the Corvette three times after the report of transmission damage and concluded each time the transmission damage was unrelated to the theft.

Plaintiff has the burden of proving the transmission problem, the cause of the problem and its causal relationship to the theft. Other than indicating that their mechanic, Mullen, would testify at trial that the theft caused the transmission problem, plaintiff has provided no evidence to contradict or countervail the two expert reports of Ms. Keri and Mr. Siegal of State Farm. Moreover, plaintiff has not established by clear and convincing evidence that State Farm acted in bad faith when it relied on its experts in denying plaintiff's transmission claim.

In *Bostick v. ITT Hartford Group Inc.*, 56 F. Supp.2d 580 (E.D. 1999), the court granted defendant insurer's motion for summary judgment on the bad faith claim because the insurance company had relied on an expert report in denying coverage. The court stated:

"Whether or not the defendants' expert correctly assessed the cause of the damage, the plaintiffs have not presented evidence to substantiate their claim that Hartford acted unreasonably. Bad faith cannot be found where the insurer's conduct is in accordance with a reasonable but incorrect interpretation of the insurance policy and the law." *Id.* at 27.

The exact scenario is presented in the instant case. State Farm relied on its experts in denying coverage on the transmission claim. Plaintiff has not presented clear and convincing evidence that State Farm acted unreasonably in their reliance.

Plaintiff attempts to buttress his claim for bad faith by alleging that he was ill-treated by State Farm because he is an African-American. Yet he has no relevant evidence that any State Farm employee he dealt with was aware he is of African-American descent. He has conceded this

lack of evidence in his deposition. Deposition at 179, 191. Accordingly, this allegation of bad faith must fail.

Plaintiff argues further that State Farm violated the Pennsylvania Unfair Insurance Practices Act, 40 Pa.C.S. §1171.1 et seq. by committing and performing unfair claim settlement or compromise practices with such frequency as to constitute a business practice. Plaintiff, however, has offered *no* evidence to suggest that State Farm's actions in his case were committed with such frequency as to constitute a business practice. A further obstacle to this bad faith cause of action under the UIPA is that the statute does not create a private cause of action. *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Company*, 494 Pa. 501, 507, 431 A.2d 966, 970 (1981). Thus, while evidence of violations of the UIPA may help a plaintiff meet its evidentiary burden under section 8371 (and note, plaintiff has shown no violations), there is no private cause of action under the UIPA or the Pa. code implementing the UIPA.

Finally, plaintiff asserts that State Farm acted in bad faith when they denied payment for reimbursement of plaintiff's transportation costs while his Corvette was unavailable. As plaintiff has admitted however, his insurance contract with State Farm did not provide this type of coverage nor did he ever provide any documentation supporting his assertion that he in fact incurred such expenses. Accordingly, State Farm did not act in bad faith in denying plaintiff's claim for transportation costs.

## CIVIL ACTION NO. 97-16355

After the initiation of the 1995 action, plaintiff filed this 1997 action alleging that Michael Murphy, Esquire,

independent counsel for State Farm, and investigators at Egis International Inc., an independent investigation firm hired by Murphy, engaged in discovery and litigation abuse amounting to bad faith. Further, plaintiff alleges that State Farm is vicariously liable for such misconduct by Murphy and Egis. Plaintiff's claims also sound in slander and defamation. For the reasons that follow, summary judgment was granted in favor of defendant in this action.

Sanders alleges that State Farm, through its counsel, filed multiple and duplicative pleadings and motions in civil action no. 95-4815 which amounts to bad faith under section 8371. As a matter of law, the complained of conduct (assuming State Farm can be held vicariously liable for counsel's conduct) during litigation does not amount to bad faith. Section 8371 is designed to provide "a remedy for bad-faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit filed against it by an insured." *O'Donnell, supra,* 734 A.2d at 909, quoting *Slater v. Liberty Mutual Insurance Company,* 1999 U.S. Dist. Lexis 3753, 1999 WL 178367 (E.D. Pa. filed March 30, 1999). While *O'Donnell, supra,* established that a plaintiff's bad faith claim can include evidence of the insurer's bad faith that occurred after the filing of the complaint, it is equally clear that section 8371 does not contemplate actions for bad faith for discovery violations. Filing of motions and pleadings is akin to discovery practice, therefore we believe plaintiff has no cause of action for bad faith based on defendant's filing of motions and pleadings in the underlying bad faith action.

Plaintiff also alleges that State Farm committed bad faith when an investigator for Michael Murphy, Esquire,

State Farm's outside independent counsel, questioned witnesses at Murphy's direction and allegedly insinuated to them that plaintiff was somehow involved in the theft of his own car. Assuming the truth of this allegation, it still does not rise to the level of bad faith. This type of discovery abuse has nothing to do with the parties' insured-insurer relationship. Indeed, plaintiff's claim had already been paid. It arises from the adversarial nature of their relationship as litigants. If plaintiff was aggrieved by defendant's actions during discovery, his remedy was under the Pennsylvania Rules of Civil Procedure not section 8371.

Plaintiff has a more fundamental problem with this 1997 action. Both counsel and his investigator in the 1995 action are independent contractors of State Farm, and therefore, State Farm cannot be held vicariously liable for their actions. An employer will not be held liable for harm caused by acts of independent contractors. *Lutz v. Cybularz*, 414 Pa. Super. 579, 607 A.2d 1089 (1992). Under Pennsylvania law, an attorney in private practice who is retained to handle particular matters acts on behalf of his client in the capacity of an independent contractor and not an employee. *Ingersoll-Rand Equipment Corp. v. Transportation Insurance Co.*, 963 F. Supp. 452, 454 (M.D. Pa. 1997). An attorney's negligence therefore cannot be imputed to his client. *Id.* In the instant case, the connection is further attenuated since the independent counsel retained the independent investigator. Accordingly, State Farm cannot be held vicariously liable for the actions of Murphy and McGlinn in litigating and investigating the 1995 action.

There is a further reason State Farm is not liable for the investigators alleged defamatory statements and in-

nuendoes about plaintiff. Under Pennsylvania law, certain communications by counsel during the course of the litigation are privileged and therefore immune from liability for defamation and slander. *Post v. Mendel*, 510 Pa. 213, 507 A.2d 351 (1986). Whether a challenged communication is published prior to or during a judicial proceeding, it must bear a certain relationship to the proceeding so as to qualify it as privileged. *Id.*

In the instant case, the investigator acting as the agent of counsel interviewed people named by Sanders as witnesses in the 1995 action. The interviews were performed in the regular course of judicial proceedings. Even if plaintiff can demonstrate that the investigators alleged statements are defamatory and slanderous, those statements qualify for immunity from claims of slander and defamation.

Accordingly, it is for all the above reasons that defendant's motion for summary judgment in civil action no. 97-16355 was granted.